**SHIELDS LIMITED PARTNERSHIP,**
Petitioner,

v.

**Boo Nathaniel BRADBERRY and 40/40
Enterprises, Respondents**

No. 15-0803

Supreme Court of Texas.

Argued March 23, 2017

OPINION DELIVERED: May 12, 2017

Rehearing Overruled September 22, 2017

John Sepehri, Austin, for Amicus Curiae Texas Apartment Association.

Dylan B. Russell, Joseph O. Slovacek, Paul Aram Pilibosian, Hoover Slovacek LLP, Houston, for Petitioner.

W. Carter Boisvert, Friedman & Feiger, L.L.P., Dallas, for Respondents.

Justice Guzman delivered the opinion of the Court.

In this forcible-detainer action,[1] a commercial landlord seeks to oust a long-term tenant claiming a superior right of immediate possession under a lease-extension option. Though the tenant frequently defaulted on the lease's rental-payment terms, the landlord regularly accepted the tenant's rental payments when tendered and without protest. The parties had agreed, however, that the landlord's "acceptance of late installment of Rent shall not be a waiver and shall not estop Landlord from enforcing that provision or any other provision of [the] lease in the future"; "all waivers" must be "in writing and signed by the waiving party"; and any forbearance of enforcement shall not be construed to constitute a waiver.[2]

Express contract terms notwithstanding, the tenant asserts the landlord waived the contractual nonwaiver provision by accepting late payments without protest and, therefore, cannot deny force and effect to a lease extension the tenant had the option to exercise if he had "fulfilled all of the

1. *See* TEX. PROP. CODE § 24.002 (authorizing a suit to obtain possession of real property from one who refuses to surrender possession).

2. "Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of any other violation or default."

terms and conditions" of the lease. The tenant contends the landlord's conduct in accepting late rental payments waived the contractual nonwaiver clause. The decisive issue is whether waiver of a nonwaiver provision can be anchored in the same conduct the parties specifically agreed would not give rise to a waiver of contract rights. We hold it cannot.[3] A contrary conclusion could not be squared with Texas's strong public policy favoring freedom of contract[4] or with the notion that waiver requires intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.[5] The

lease's plain terms permit the landlord to rely on the contractual nonwaiver clause and accept due and payable, but late, rental payments without waiving its right to enforce the lease as written.

Though we do not hold a nonwaiver provision may never be waived,[6] there must, at a minimum, be some act inconsistent with its terms.[7] Here, the record bears no evidence the landlord acted inconsistently with the contract's express terms. Nor has the tenant identified any false or misleading representation supporting an equitable-estoppel bar to eviction, as the tenant asserts. We therefore reverse the

3. See S.H.V.C. v. Roy, 188 Conn. 503, 450 A.2d 351, 354-55 (1982) ("The appellate court found that the only evidence offered in support of the defense of waiver was the acceptance by the plaintiff of late rental payments and that this evidence alone was insufficient to establish a waiver in light of the nonwaiver clause in the lease. It further concluded that the same evidence was also inadequate to prove an estoppel. We support this conclusion...."); Stephens v. State, 501 P.2d 759, 761-62 & n.2 (Ala. 1972) ("[W]here a lease contains a non-waiver provision such as the one contained in the subject lease [which disclaims acceptance of late rent as waiver], courts have given full effect to those provisions and have held that previous failures on the landlord's part to cancel for a breach of a covenant do not constitute a waiver of such a provision. Thus, given the existence of a nonwaiver provision, the landlord may demand strict compliance with a lease provision concerning time of payment without giving prior notice of such demand."); see also Van Bibber v. Norris, 275 Ind. 555, 419 N.E.2d 115, 121 (1981) (noting that a rule permitting waiver of a nonwaiver clause by accepting late payments is "illogical, since the very conduct which the clause is designed to permit[—]acceptance of late payment[—]is turned around to constitute waiver of the clause permitting the conduct").

4. See Gym–N–I Playgrounds, Inc. v. Snider, 220 S.W.3d 905, 912 (Tex. 2007) (reaffirming that competent parties " 'shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be en-

forced by Courts of justice' " (quoting BMG Direct Mktg., Inc. v. Peake, 178 S.W.3d 763, 767 (Tex. 2005))); see also Phila. Indem. Ins. Co. v. White, 490 S.W.3d 468, 471 (Tex. 2016) (noting courts must enforce contract terms absent compelling reasons); In re Prudential Ins. Co. of Am., 148 S.W.3d 124, 129 (Tex. 2004) (orig. proceeding) ("As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy.").

5. See In re Nationwide Ins. Co. of Am., 494 S.W.3d 708, 712 (Tex. 2016) (orig. proceeding).

6. See, e.g., 13 WILLISTON ON CONTRACTS § 39:36 (4th ed. 2013) (noting that the "general rule, that a party to a written contract may waive a provision despite the existence of an antiwaiver or failure to enforce clause, is based on the view that the nonwaiver provision itself, like any other term in the contract, is subject to waiver by agreement or conduct during performance"; however, "[i]n order to establish that an antiwaiver clause is not enforceable, the party asserting a waiver must show a clear intent to waive both the clause and the underlying contract provision").

7. See New Amsterdam Cas. Co. v. Hamblen, 144 Tex. 306, 190 S.W.2d 56, 59 (1945) ("[W]e know of no theory under which the non-waiver agreement may be broken through and a waiver decreed notwithstanding its provisions unless the acts are inconsistent with its terms.").

court of appeals' judgment rejecting the landlord's forcible-detainer action, render judgment in the landlord's favor, and remand to the trial court to award attorney's fees in accordance with the parties' contract.[8]

## I. Factual and Procedural Background

Shields Limited Partnership (Shields) owns commercial property housing the San Francisco Rose restaurant in Dallas, Texas. Boo Nathaniel Bradberry and 40/40 Enterprises, Inc. (collectively Bradberry) claim a superior right to immediate possession of the property as tenants under sublease and sub-sublease agreements executed in 2005. Shields argues Bradberry is merely a month-to-month holdover tenant while Bradberry counters that he effectively exercised an option to extend the lease through May 31, 2017.

The pertinent terms of the base lease, sublease, and sub-sublease provide as follows:

- Monthly rent is due "without . . . prior demand" on the first day of the month. Failure to pay rent by the tenth day of the month is "an event of default" under the lease.

- "All waivers must be in writing and signed by the waiving party. Landlord's failure to enforce any provisions of this Lease or its acceptance of late installments of Rent shall not be a waiver and shall not estop Landlord from enforcing that provision or any other provision of this Lease in the future."

- "If Tenant has fulfilled all of the terms and conditions of the initial lease period [expiring May 31, 2007], he shall have the option to extend the lease for an additional 5-year period at the rate of $3,000/month [expiring May 31, 2012]. Tenant will notify Landlord's Agent in writing of his intention to exercise this option no later than ninety (90) days prior to the expiration of the initial lease period."

- If the tenant does not vacate the premises upon the expiration of the lease, occupancy converts to a month-to-month tenancy, subject to the terms of the lease and a holdover rent of $3,000 per month.

- Bradberry assumed the tenant's obligations as outlined in the base lease; the sublease is subordinate to the base lease; and if the terms of the base lease were fulfilled on June 1, 2007, Bradberry was to sign a new lease with Shields and thereby become the "tenant" rather than the "subtenant" (which never happened).

- "If Subtenant [Bradberry] has fulfilled all the terms and conditions of the lease and option set forth [in the base lease], he shall have the option as Tenant to extend the lease for an additional 5 years from June 1, 2012, through May 31, 2017" with a new rental rate tied to the Consumer Price Index (CPI) and payment of a pro-rata share of property taxes "when billed by the Principal Realtor or Landlord."

8. With respect to attorney's fees, the lease provides: "If on account of any breach or default by any party hereto in its obligations to any other party hereto . . ., it shall become necessary for the nondefaulting party to employ an attorney to enforce or defend any of its rights or remedies hereunder, the default-ing party agrees to pay the nondefaulting party its reasonable attorneys' fees, whether or not suit is instituted in connection therewith." *See Travelers Indem. Co. v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996) (attorneys fees recoverable as authorized by statute or contract).

- Bradberry also had the option to extend the lease for two additional five-year periods—ending May 31, 2027—on the same terms as above, including giving timely notice, fulfilling all the terms of the base lease through each preceding option period, paying CPI-adjusted rent, and paying a pro-rata share of property taxes.
- Rent and all notices were to be delivered to the landlord's "Principal Broker," which was J.W. Lindsley & Co. until December 2011 and, thereafter, S.E. Covington & Company (Covington).

As specified in the parties' agreements, following the May 31, 2012 expiration of the base lease's initial option period, Bradberry had the option to extend the lease term for three successive five-year periods, the last of which would expire on May 31, 2027. Bradberry's option to extend the lease was contingent on Bradberry (1) timely exercising the option in writing and (2) "fulfill[ing] all of the terms and conditions of the [base] lease and [preceding] option[s]." Importantly, had Bradberry exercised the option to extend the lease, the rent, which had been fixed at $3,000 per month, would fluctuate annually based on the CPI-adjusted formula prescribed in the sublease with the modified base amount compounded annually.[9] Moreover, Bradberry would be required to pay a pro-rata share of property taxes "when billed by the Principal Realtor or Landlord."

In September 2011, Bradberry notified the landlord, in writing via J.W. Lindsley & Co., that he intended to exercise his option to extend the lease from June 1, 2012, to May 31, 2017. The notice, ostensibly delivered more than ninety days before the lease was set to expire, was also timely.[10]

Bradberry was not as timely with his rental payments, regularly violating the lease terms by paying rent past the due date and cure period—with the extent of the deviation varying from relatively slight to significant. Without fail, the landlord, intent on getting paid, accepted the rent when tendered without protest or assessment of late fees. Bradberry was current with his rent when he purported to exercise the option, but by the time May 31, 2012, rolled around, he was one month late with the rent. Bradberry did not tender the outstanding rent until June 13, 2012, and the late rental payment was, again, accepted without protest.

If Bradberry had properly exercised the option, his rental rate starting June 1, 2012, would have been $3,340 per month, as required by the lease's CPI-adjusted rent provision. But rather than paying the

9. The formula provided that rent would be calculated in the following manner:
 The monthly rent for the first 12 months beginning June 1, 2012, and ending May 31, 2013, shall be computed by multiplying $3000 by the CPI for April, 2012, and dividing the result by the CPI for April, 2007, with this figure being rounded up or down to the closest whole number divisible by 5. The rental for each of the following 12 month periods beginning with June 2013, will be adjusted to reflect any changes in the CPI in the following manner: the new monthly rent for each period shall be computed by multiplying the monthly rent dur-
 ing the preceding 12 month period by the CPI for April of the year in which the adjustment is being made and dividing the result by the CPI for April of the preceding year.

10. In the proceedings below, Shields disclaimed receipt of written notice to exercise the option, but the matter is not disputed for purposes of this appeal. The notice Bradberry relies on is addressed to the party designated to receive notices on the landlord's behalf, but does not show the address to which the notice was delivered.

amount due under the lease-extension option, Bradberry continued to pay $3,000 for monthly rent. And even paying this lesser amount, Bradberry persisted in paying rent untimely and irregularly.

On November 30, 2012, the landlord's principal broker, Covington, emailed Bradberry notice of the penalties he had incurred for late November and December rent payments. The email expressed, for the first time in writing, a belief that a month-to-month tenancy governed the relationship with a rental rate of $3,000 per month: "It is my understanding the landlord is trying to get things current in an effort for us to deliver you a new lease for your space vs. the month to month you are currently on in the space etc." Without disputing the existence of the claimed month-to-month tenancy, Bradberry responded a few days later that a cashier's check for outstanding rent would arrive the following day via overnight mail.

When the rent failed to arrive as promised, Covington sent Bradberry a notice of default on December 18, 2012. In addition to responding that the check was "already in the mail," Bradberry reported his understanding that he was under lease through May 31, 2017, with two additional lease-extension options through 2027. Bradberry made clear that, since 2005, he had invested over $250,000 to improve the property and would not have done so absent the option to extend the lease through 2027. He concluded the letter with "now that we are current as of December 19, 2012 it would be great to get the 'new' lease taken care of as soon as possible."

In October 2013, after sending additional default notices for late rent, Shields offered Bradberry a new lease with a rental rate of $9,700.83 per month. Bradberry promptly rejected the proposed lease, and Shields notified Bradberry he would have to vacate the premises within 30 days, claiming he had converted to a month-to-month tenancy on June 1, 2012. Bradberry refused to surrender possession, and Shields instituted eviction proceedings.

The justice court ruled in Bradberry's favor. The result was the same following a bench trial de novo in the county court. There, the court rendered a take-nothing judgment against Shields and awarded Bradberry his attorney's fees through trial and on appeal. No findings of fact or conclusions of law were made or requested; however, the final judgment states that Shields "failed to sustain its burden of proof in establishing that it has a superior right to immediate possession of the [leased] premises."

The court of appeals affirmed, holding:

The trial court could have found that Shields's acceptance of the late May rent payment without protest constituted acceptance of the payment as fulfilling the obligations under the lease. The trial court could have determined that if Shields had meant to accept the late payment but also object to the lack of compliance with the lease's requirement of timely payment, Shields would have had to do something, such as impose late fees or declare the lease in default, indicating that the late payment did not constitute compliance with the lease. The trial court could have found that Shields's conduct of accepting the late May 2012 rent payment without protest was not consistent with an assertion that Bradberry had failed to fulfill the obligations of the lease. Because Bradberry had previously given Shields timely notice of his intent to exercise the extension option, the extension took effect.[11]

11. 2015 WL 3866829, at *5, 518 S.W.3d 49, 55 (Tex. App.—Dallas 2015).

The court of appeals also summarily rejected Shields's alternative argument that, even if Bradberry had successfully exercised the extension option, he was in default under the lease based on his failure to pay CPI-adjusted rent starting June 1, 2012. Although Shields had asked the trial court to take judicial notice of the CPI, including for April 2012, which produced a new base rental rate of $3,340 per month, the court of appeals said Shields failed to ask the trial court to take judicial notice of the April 2013 CPI specifically. The court explained that, without evidence of the April 2013 CPI, Shields "failed to prove conclusively that Bradberry owed any more rent than what he had paid [at the time] Shields declared the lease terminated for failure to pay the rent as adjusted by the CPI."[12]

## II. Discussion

█ The sole focus of a forcible-detainer action is the right to immediate possession of real property.[13] To establish a superior right to immediate possession, Shields had the burden to prove (1) Shields owns the property, (2) Bradberry is either a tenant at will, tenant at sufferance, or a tenant or subtenant willfully holding over after the termination of the tenant's right of possession, (3) Shields gave proper notice to Bradberry to vacate the premises, and (4) Bradberry refused to vacate the premises.[14] The parties do not dispute that Shields owns the property and gave proper notice or that Bradberry refused to vacate the premises. The only dispute is whether the record conclusively establishes that Bradberry's right of possession terminated.

Disposition of that matter ultimately turns on the force and effect of the parties' nonwaiver agreement, which unequivocally precludes a defense of waiver premised on the landlord's acceptance of late rental payments. We note our appellate courts have treated nonwaiver provisions inconsistently.[15] We may therefore exercise jurisdiction over this appeal, despite its origin,[16] because an opinion of this Court addressing the matter would "remove unnecessary uncertainty in the law and unfairness to litigants."[17]

Citing the specific language of the lease's nonwaiver clause, Shields asserts that acceptance of late payments, without more, can never effect a waiver of either

12. *Id.*

13. *Mohammed v. D. 1050 W. Rankin, Inc.*, 464 S.W.3d 737, 740 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

14. TEX. PROP. CODE § 24.002; *see also Elwell v. Countrywide Home Loans, Inc.*, 267 S.W.3d 566, 568-69 (Tex. App.—Dallas 2008, pet. dism'd w.o.j.).

15. *Compare, e.g., Giller Indus., Inc. v. Hartley*, 644 S.W.2d 183, 184 (Tex. App.—Dallas 1982, no writ), *with Winslow v. Dillard Dep't Stores*, 849 S.W.2d 862, 864 (Tex. App.—Texarkana 1993, writ denied), *Zwick v. Lodewijk*, 847 S.W.2d 316, 318 (Tex. App.—Texarkana 1993, writ denied), and *Regent Int'l Hotels, Ltd. v. Las Colinas Hotels Corp.*, 704 S.W.2d 101, 104 (Tex. App.—Dallas 1985, no writ); *see also Enserch Corp. v. Rebich*, 925 S.W.2d 75, 82 (Tex. App.—Tyler 1996, writ dism'd by agr.) (recognizing that subsequent to *Giller*, at least three cases—*Winslow*, *Zwick*, and *Regent International Hotels*—have reached a contrary result regarding the effect of nonwaiver provisions).

16. *See* TEX. GOV'T CODE § 22.225(b)(1), (c), (e) (absent a conflict among the courts of appeals on a material legal question or a dissent in the case, no appeal to this Court is permitted in a "case appealed from a county court ... when, under the constitution, a county court would have had original or appellate jurisdiction of the case").

17. *Id.* § 22.225(c), (e); *see, e.g., 1/2 Price Checks Cashed v. United Auto. Ins. Co.*, 344 S.W.3d 378, 382 n.7 (Tex. 2011).

the nonwaiver agreement or Shields's contractual right to enforce strict compliance with the option requirements.[18] Shields argues it follows then that Bradberry failed to successfully exercise the sublease's first five-year option period because he was in default on his rent when the base lease expired on May 31, 2012, and as a result, had not "fulfill[ed] all the terms and conditions of the lease and option[s]."

Shields contends Bradberry became a month-to-month holdover tenant at that point, meaning Shields was entitled to terminate the tenancy at any time with proper notice.[19] To emphasize the argument, Shields notes that Bradberry continued to pay $3,000 per month in rent after the base lease terminated and never paid the enhanced CPI-adjusted rental amount required under the terms of the option. Moreover, Bradberry had never paid the pro-rata tax payments that would have been required if the lease had been extended pursuant to the option. Relying on these undisputed facts, Shields asserts it has not acted inconsistently with its position that Bradberry's attempt to exercise the option was ineffective, neither demanding nor accepting an enhanced rental payment or property tax payments. Alternatively, Shields argues that Bradberry was in default under the lease even if the option was properly exercised and must surrender possession, notwithstanding Shields's acceptance of late and insufficient rental payments.

Bradberry acknowledges he was more than a month late in paying the May 2012 rental payment. He argues, however, that timeliness of the May 2012 rental payment is irrelevant because (1) he exercised the option in September 2011 by delivering notice to the party designated in the lease, (2) he had fulfilled all the lease's terms at that time, and (3) the option was effective as soon as he delivered the notice. In the alternative, Bradberry maintains that Shields waived defective performance, if any, by accepting the May 2012 payment without protest and without rejecting Bradberry's election to extend the lease.

Concerning the enhanced rental payments that would be due under a properly exercised lease extension, Bradberry claims Shields was required to give notice that a different rental rate was due and to bill him for his portion of the tax payments. Bradberry also raises an estoppel defense, suggesting he detrimentally relied on the promise of lease extensions through 2027 in making substantial improvements to the property during his time as a tenant, including approximately $30,000 in improvements after he purported to exercise the option.

To support his estoppel defense, Bradberry cites a statement in the September 2011 option letter, in which he inquired about the prospect of obtaining an additional five-year option period (through 2032) on the basis that he was "looking at doing another big renovation to turn the bar into an island style bar, which will probably be a $30,000 [renovation]." Though there is no evidence Shields entertained the request, Bradberry completed construction on the referenced improvements in March 2012 or 2013, and Shields's

---

18. Amicus curiae Texas Apartment Association, Inc. (TAA) argues the same. TAA asserts that its standard and specialized form leases contain nonwaiver provisions that landlords rely on to accept late rental payments while retaining their legal remedies. TAA has expressed concern that the court of appeals' opinion requires landlords to take immediate enforcement action against late payers, which would lead to higher costs for landlords and tenants and may deter the development of multifamily properties in an era marked by housing-affordability concerns.

19. See TEX. PROP. CODE § 24.002.

representative noticed the work had been completed when he visited the property.[20]

We agree with Shields that, as a matter of law, accepting late rental payments does not waive the nonwaiver provision in the underlying lease or, correspondingly, the contractual requirement that rent is due on the first of the month, without prior demand, and no later than the tenth day of the month. Moreover, Shields did not act inconsistently with its right to accept untimely rent without waiving the nonwaiver provision.

## A. Standard of Review

When neither party requests findings of fact and conclusions of law following a nonjury trial, all fact findings necessary to support the trial court's judgment are implied.[21] If the reporter's record is filed on appeal, as it was here, implied findings may be challenged on factual- and legal-insufficiency grounds in the same manner "as jury findings or a trial court's [express] findings of fact," but this Court only has jurisdiction over legal-sufficiency challenges.[22]

Evidence is legally insufficient to support a jury finding when (1) the record bears no evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact.[23] When determining whether legally sufficient evidence supports a finding, we must consider evidence favorable to the finding if the factfinder could reasonably do so and disregard evidence contrary to the finding unless a reasonable factfinder could not.[24] When a party attacks the legal sufficiency of an adverse finding on an issue on which it bears the burden of proof, the judgment must be sustained unless the record conclusively establishes all vital facts in support of the issue.[25] In this case, Shields asserts the lease's nonwaiver provision applies as a matter of law and the record bears no evidence it has been waived.[26]

20. The record presents conflicting evidence regarding the year the renovations were completed. Bradberry testified that the improvements were completed before St. Patrick's Day 2013, but an email to the property manager dated February 15, 2012, states the renovations would be completed before St. Patrick's Day of that year.

21. *See Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003).

22. *Id.* (implied findings on special-appearance issue may be reviewed if the clerk's and reporter's record are filed); *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989) (statement of facts—now called the reporter's record—is necessary to challenge implied findings on evidentiary grounds after a nonjury trial); *see also In re S.M.R.*, 434 S.W.3d 576, 586 (Tex. 2014) (this Court lacks jurisdiction to determine factual-sufficiency evidentiary questions).

23. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998).

24. *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014).

25. *Mo. Pac. R. Co. v. Limmer*, 299 S.W.3d 78, 84 n.30 (Tex. 2009); *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

26. *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 485 (Tex. 2016) ("'[A]n affirmative defense 'defeats the plaintiff's claim without regard to the truth of the plaintiff's assertions' and places 'the burden of proof [] on the defendant to present sufficient evidence to establish the defense and obtain the requisite jury findings.'" (quoting *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 156-57 (Tex. 2015))); *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996) (noting waiver is an affirmative defense); *Shoemake v. Fogel,*

## B. Nonwaiver Provisions

The right to possession of the leased premises is governed by the commercial lease between Shields and Bradberry. The lease terms require Bradberry to pay rent on time, in full, and without demand. Rent paid more than ten days late is a default under the lease. Further, Bradberry's option to extend the lease was contingent on all the terms and conditions of the lease being "fulfilled."

With regard to enforcement of the lease terms, Shields and Bradberry agreed that:

> All waivers must be in writing and signed by the waiving party. Landlord's failure to enforce any provisions of this Lease or its acceptance of late installments of Rent shall not be a waiver and shall not estop Landlord from enforcing that provision or any other provision of this Lease in the future.

The record bears no evidence that the parties ever agreed in writing to waive any lease obligation, and no party claims otherwise. Rather, the issue is simply whether Shields could, by its conduct, manifest clear intent to waive the nonwaiver provision. Otherwise, the nonwaiver provision is facially dispositive.

On that score, the parties view the effect of the nonwaiver provision differently. While Shields asserts that a nonwaiver provision may not be waived by engaging in the very act the contract disclaims as constituting waiver, Bradberry argues that nonwaiver provisions are "wholly ineffective" and can be waived to the same extent as any other contractual provision. In Bradberry's view, Shields waived its enforcement rights, including requiring strict compliance with the terms of the lease-extension option, by accepting his tardy rental payments without specific rebuke.

▄▄▄ We consider the force and effect of a nonwaiver provision in light of Texas's public policy that "strongly favors freedom of contract." [27] We have repeatedly reaffirmed that competent parties " 'shall have the utmost liberty of contract, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice.' " [28] This " 'paramount public policy' " mandates that courts " 'are not lightly to interfere with this freedom of contract.' " [29] "Absent compelling reasons, courts must respect and enforce the terms of a contract the parties have freely and voluntarily entered," [30] and "[a]s a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy." [31] Given Texas's strong public policy favoring freedom of contract, there can be no doubt that, as a general proposition, nonwaiver provisions are binding and enforceable. [32] This acknowledgment accords with our treatment

Ltd., 826 S.W.2d 933, 937 (Tex. 1992) ("Generally, an affirmative defense is waived if it is not pleaded." (citing Tex. R. Civ. P. 94)); cf. Ellis v. Schlimmer, 337 S.W.3d 860, 862 (Tex. 2011) (proof that a valid arbitration agreement exists shifts the burden to the party opposing arbitration to raise an affirmative defense, such as waiver, to the agreement's enforcement).

27. Gym–N–I Playgrounds, Inc. v. Snider, 220 S.W.3d 905, 912 (Tex. 2007); In re Prudential Ins. Co. of Am., 148 S.W.3d 124, 129 (Tex. 2004) (orig. proceeding); see also Phila. Indem., 490 S.W.3d at 471 ("Texas's strong pub-

lic policy favoring freedom of contract is firmly embedded in our jurisprudence.").

28. Gym–N–I Playgrounds, 220 S.W.3d at 912 (quoting BMG Direct Mktg., Inc. v. Peake, 178 S.W.3d 763, 767 (Tex. 2005)).

29. Id. (quoting BMG Direct, 178 S.W.3d at 767).

30. Phila. Indem., 490 S.W.3d at 471.

31. In re Prudential, 148 S.W.3d at 129.

32. See Phila. Indem., 490 S.W.3d at 471 (noting courts must enforce contract terms absent compelling reasons); In re Prudential, 148

of nonwaiver agreements in the insurance context.[33]

Here, however, the question is not whether the nonwaiver clause in the parties' agreement is enforceable, but whether that clause is waivable and, if so, the circumstances under which waiver may occur. We have not extensively explored this topic, but we have recognized "a broad freedom of contract"[34] and concluded parties can contractually waive certain substantive and procedural rights.[35]

■■■ Freedom of contract is a policy of individual self-determination;[36] individuals can control their destiny and structure their business interactions through agreements with other competent adults of equal bargaining power, absent violation of law or public policy.[37] The contractual doctrine of waiver, whether express or implied, rests on a similar conceptual policy of individual self-determination—"'an idea no more complicated than that any competent adult can abandon a legal right and if he does so then he has lost it forever.'"[38] To the extent there has been any doubt up to this time, we affirm that a party's rights under a nonwaiver provision may indeed

---

S.W.3d at 129 ("As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy."); cf. In re Universal Underwriters of Tex. Ins. Co., 345 S.W.3d 404, 407 (Tex. 2011) (orig. proceeding) (concluding appraisal clauses "are generally enforceable, absent illegality or waiver").

33. See, e.g., Emp'rs Cas. Co. v. Tilley, 496 S.W.2d 552, 559 (Tex. 1973) (recognizing nonwaiver agreements are enforceable, but noting "[n]on-waiver agreements are strictly construed against the insured and will not be extended by implication beyond their exact terms"); Mass. Bonding & Ins. Co. v. Orkin Exterminating Co., 416 S.W.2d 396, 401 (Tex. 1967) (noting this Court's prior holding "that an issue of waiver would have been raised but for the execution of a nonwaiver agreement the day after late notice of an accident had been received by the insurer") (citing New Amsterdam Cas. Co. v. Hamblen, 144 Tex. 306, 190 S.W.2d 56 (1945)); Walters v. Century Lloyds Ins. Co., 154 Tex. 30, 273 S.W.2d 66, 69 (1954) (distinguishing a previous case because there "the parties signed a 'nonwaiver' agreement that was binding on both parties"); Provident Fire Ins. Co. v. Ashy, 139 Tex. 334, 162 S.W.2d 684, 686 (1942) (noting the nonwaiver agreement "must be given effect because 'our courts have uniformly held that non-waiver agreements executed by the insured and insurer, previous to an investigation to be made, by which parties may proceed without waiving their rights, are binding on the parties'" (quoting City of Wichita Falls v. Travelers Ins. Co., 137 S.W.2d 170, 178 (Tex. Civ. App.—Fort Worth 1940, writ dism'd judgm't cor.))).

34. Nafta Traders, Inc. v. Quinn, 339 S.W.3d 84, 95 (Tex. 2011) ("As a fundamental matter, Texas law recognizes and protects a broad freedom of contract.").

35. See Gym–N–I Playgrounds, Inc. v. Snider, 220 S.W.3d 905, 912 (Tex. 2007) (concluding that Texas's strong freedom-of-contract policy supported the conclusion that the implied warranty of suitability may be contractually waived); In re Prudential, 148 S.W.3d at 132 (holding that parties are free to waive their right to a jury trial); Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 181 (Tex. 1997) (concluding parties may contractually waive the ability to bring fraudulent-inducement claims).

36. See Lon L. Fuller, Consideration and Form, 41 Colum. L. Rev. 799, 806 (1941) ("Among the basic conceptions of contract law the most pervasive and indispensable is the principle of private autonomy. This principle simply means that the law views private individuals as possessing a power to effect, within certain limits, changes in their legal relations.").

37. In re Prudential, 148 S.W.3d at 129 ("As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy.").

38. 13 Williston on Contracts § 39:14 (4th ed. 2013) (quoting McElroy v. B.F. Goodrich Co., 73 F.3d 722, 724 (7th Cir. 1996)).

be waived expressly or impliedly.[39] On this point, there is much agreement.[40]

But the mere fact that a nonwaiver provision may be waived does not render the provision "wholly ineffective." Bradberry's position, and the cases he cites in support,[41] primarily rely on Arthur Corbin's

**39.** This is not a novel concept. Long ago, two of our country's most distinguished jurists—Benjamin Cardozo and Oliver Wendell Holmes—affirmed most eloquently that freedom of contract includes not only the power to make a contract, but also the freedom to waive, modify, or unmake the contract. Justice Holmes, writing for the Massachusetts Supreme Judicial Court, proclaimed: "Attempts of parties to tie up by contract their freedom of dealing with each other are futile." *Bartlett v. Stanchfield*, 148 Mass. 394, 19 N.E. 549, 550 (1889). And Justice Cardozo, writing for the Court of Appeals of New York, observed: "Those who make a contract may unmake it. The clause which forbids a change may be changed like any other." *Beatty v. Guggenheim Expl. Co.*, 225 N.Y. 380, 122 N.E. 378, 381 (1919).

**40.** *See, e.g., Hobby Lobby Stores, Inc. v. Standard Renewable Energy, LP*, No. 02-15-00124-CV, 2016 WL 4247969, at *5 (Tex. App.—Fort Worth Aug. 11, 2016, pet. denied) (mem. op.) ("But Texas courts, including this court, have held that a nonwaiver provision, like any other contractual provision, may be waived, depending upon the facts of the case."); *Breof BNK Tex., L.P. v. D.H. Hill Advisors, Inc.*, 370 S.W.3d 58, 66 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("Although non-waiver clauses may themselves be waived, they are generally considered valid and enforceable."); *A.G.E., Inc. v. Buford*, 105 S.W.3d 667, 676 (Tex. App.—Austin 2003, pet. denied) (same); 13 WILLISTON ON CONTRACTS § 39:36 (4th ed. 2013) ("[T]he nonwaiver provision itself, like any other term in the contract, is subject to waiver by agreement or conduct during performance."); *see also Wis. Elec. Power Co. v. Union Pac. R.R. Co.*, 557 F.3d 504, 509 (7th Cir. 2009) ("[T]he waiver of a no-waiver clause must be 'proved by clear and convincing evidence.'" (quoting *Chi. College of Osteopathic Med. v. George A. Fuller Co.*, 776 F.2d 198, 202 (7th Cir. 1985))); *Exxon Corp. v. Crosby–Miss. Res., Ltd.*, 40 F.3d 1474, 1491 (5th Cir. 1995) (agreeing that a no-waiver provision could be waived); *Transpower Constrs. v. Grand River Dam Auth.*, 905 F.2d 1413, 1419 (10th Cir. 1990) (noting that it would be unjust for the court to enforce a no-waiver provision after the party had essential-

ly waived the benefits of the provision's protection); *Westinghouse Credit Corp. v. Shelton*, 645 F.2d 869, 873-74 (10th Cir. 1981) ("[T]he weight of authority, and the view we think Oklahoma state courts would follow, is that an 'anti-waiver' clause, like any other term in the contract, is itself subject to waiver or modification by course of performance."); *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F.Supp. 1087, 1098 (S.D.N.Y. 1989) ("New York law allows the parties to waive . . . a no-waiver provision by a subsequent course of conduct."); *ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 245 P.3d 184, 196 (Utah 2010) ("Thus, under some circumstances, a no-waiver provision can itself be waived."); *Retail Devs. of Ala., LLC v. E. Gadsden Golf Club, Inc.*, 985 So.2d 924, 930 n.3 (Ala. 2007) ("This Court has consistently held that nonwaiver clauses . . . can be found to have been waived upon proper proof."); *Lee v. Wright*, 108 A.D.2d 678, 680, 485 N.Y.S.2d 543 (N.Y. App. 1985) ("[I]t has long been the rule that parties may waive a 'no-waiver' clause."). *But see DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 334 n.2 (7th Cir. 1987) (noting that although an anti-waiver clause may be waived in certain limited circumstances, the court was "reluctant to extend the possibility of waiver of an anti-waiver clause to this contractual dispute").

**41.** *See Zwick v. Lodewijk Corp.*, 847 S.W.2d 316, 318 (Tex. App.—Texarkana 1993, writ denied). ("The reasoning in *Las Colinas* appears similar to Corbin's view of nonwaiver clauses." (citing *Regent Int'l Hotels, Inc. v. Las Colinas Hotels Corp.*, 704 S.W.2d 101, 104 (Tex. App.—Dallas 1985, no writ), and 3A ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 763 (1960))); *see also, e.g., Enserch Corp. v. Rebich*, 925 S.W.2d 75, 82 (Tex. App.—Tyler 1996, writ dism'd by agr.) (noting *Winslow v. Dillard Dep't Stores* and *Zwick* "relied upon [ ] Corbin's view that contractual non-waiver clauses are ineffective and furthermore may be waived"); *Straus v. Kirby Court Corp.*, 909 S.W.2d 105, 109 (Tex. App.—Houston [14th Dist.] 1995, writ denied) (noting *Zwick* "adopted Corbin's view that a promisor may retain the power to waive a condition"); *Winslow v. Dillard Dep't Stores*, 849 S.W.2d 862,

influential treatise on contracts, which states:

> Parties to a contract cannot, even by an express provision in that contract, deprive themselves of the power to alter or vary or discharge it by subsequent agreement.... [A] provision that an express condition of a promise or promises in the contract can not be eliminated by waiver, or by conduct constituting an estoppel, is wholly ineffective. The promisor still has the power to waive the condition, or by his conduct to estop himself from insisting upon it, to the same extent that he would have had this power if there had been no such provision.[42]

We agree a nonwaiver provision absolutely barring waiver in the most general of terms might be wholly ineffective. But we cannot agree that a nonwaiver provision is wholly ineffective in preventing waiver through conduct the parties explicitly agree will never give rise to waiver. Such a contract-enforcement principle would be "illogical, since the very conduct which the clause is designed to permit [without effecting a waiver would be] turned around to constitute waiver of the clause permitting [a party to engage in] the conduct [without effecting a waiver]."[43]

The many flavors in which nonwaiver provisions may present are as varied as human capacity for language and bargain, leaving us bereft of an option for specifically delineating the circumstances under which a nonwaiver agreement may be waived *vel non*. But we can say with certainty that accepting late rental payments could not waive the parties' agreement that contractual rights, remedies, and obligations will not be waived on that basis, especially when the lease provides a specific method for obtaining a waiver.[44]

As we explained in a different context:

> [W]e know of no theory under which the non-waiver agreement may be broken through and a waiver decreed notwithstanding its provisions unless the acts are inconsistent with its terms. In the final analysis, the contention of respondents is, in effect, that petitioner waived its rights under the non-waiver agreement. They seek to destroy a non-waiver by invoking a waiver against it. The non-waiver agreement permitted petitioner to investigate fully all facts and circumstances which it might desire without thereby waiving its right to deny liability. Nothing which it did was inconsistent with its right to proceed with its investigation without effecting a waiver. It acted under the non-waiver agreement and not inconsistent with it.[45]

We therefore hold that engaging in the very conduct disclaimed as a basis for waiver is insufficient as a matter of law to

---

864 (Tex. App.—Texarkana 1993, writ denied) (noting "the reasoning in [the *Las Colinas* decision] and in ours is similar to a view of nonwaiver clauses found in Corbin's treatise on contracts").

**42.** 3A Arthur L. Corbin, Corbin on Contracts § 763 (1960) (most recent version at 8 Catherine M.A. McCauliff, Corbin on Contracts § 40.13 (rev. ed. 1999)).

**43.** *Van Bibber v. Norris*, 275 Ind. 555, 419 N.E.2d 115, 121 (1981).

**44.** The lease states that "all waivers must be in writing." Moreover, a lease of real estate for a term longer than one year, like the one here, comes within the statute of frauds. *See* Tex. Bus. & Com. Code § 26.01(a), (b)(5). "It goes without saying that a contract required to be in writing cannot be orally modified except in limited circumstances such as extension of time for performance." *Givens v. Dougherty*, 671 S.W.2d 877, 878 (Tex. 1984).

**45.** *See New Amsterdam Cas. Co. v. Hamblen*, 144 Tex. 306, 190 S.W.2d 56, 59 (1945).

nullify the nonwaiver provision in the parties' lease agreement.

## C. Waiver and Right of Possession

 For purposes of this case, the critical inquiry is whether Shields intentionally engaged in conduct inconsistent with claiming the right to enforce the nonwaiver agreement.[46] We have explained:

> Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances. There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right.[47]

Waiver is "essentially unilateral" in character and "results as a legal consequence from some act or conduct of the party against whom it operates; no act of the party in whose favor it is made is necessary to complete it."[48] Importantly, "[w]hile waiver may sometimes be established by conduct, that conduct must be unequivocally inconsistent with claiming a known right."[49]

The record here bears no evidence that deprives the nonwaiver agreement of legal force; accordingly, Shields met its burden of establishing that Bradberry's right to possession has terminated. We need not decide whether Bradberry failed to properly exercise the option, and thereby became a holdover tenant, or whether he successfully exercised the option but defaulted on his payment obligations under the lease. In either case, Shields has established a superior right to immediate possession of the leased premises.[50]

The lease did not obligate Shields to affirmatively reject the May 2012 rental payment, and its failure to do so reflects no inconsistency. Furthermore, Shields's continued acceptance of Bradberry's rental payments of $3,000 per month is consistent—not inconsistent—with Shields's claim that Bradberry became a month-to-month tenant. Had Shields demanded rent and tax payments concordant with the terms of the lease-extension option, a different scenario would be presented.

 Even if Bradberry's efforts to exercise the option were sufficient to extend the lease, Bradberry still did not comply with the terms of the lease extension. While Bradberry complains that Shields never calculated the CPI-adjusted rent amount for him, such notice is not required under the lease. To the contrary, the lease provides the formula by which Bradberry could calculate the rent due using publicly available information and further specifies that rent is due without prior demand. Parties are presumed to know the contents

46. *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (waiver requires an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right).

47. *Id.* (citations omitted).

48. *Mass. Bonding & Ins. Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396, 401 (Tex. 1967) (citing *Equitable Life Assur. Soc'y v. Ellis*, 105 Tex. 526, 147 S.W. 1152 (1912)).

49. *Van Indep. Sch. Dist. v. McCarty*, 165 S.W.3d 351, 353 (Tex. 2005).

50. Because Bradberry would not prevail even if Shields waived the right to require strict compliance with the option's terms, we need not consider whether waiving the right to insist on strict compliance with the option's requirements is conceptually distinct from acceptance of late rental payments. *Cf., e.g., Mohammed v. D. 1050 Rankin, Inc.*, 464 S.W.3d 737, 745 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("[F]ailure to exercise an option according to its terms ... is simply ineffectual, and legally amounts to nothing more than a rejection.").

of their contracts.[51] Though Bradberry presents a sympathetic case, we cannot superimpose additional requirements under the lease to achieve a result that may more equitably service one party. Our rules of contract construction simply do not permit us to rewrite a contract.

Bradberry has not identified any conduct constituting waiver other than Shields's acceptance of late installments of rent without protest. Nor do we find in the record any other conduct "unequivocally inconsistent"[52] with Shields claiming its rights under the nonwaiver provision. Because the lease explicitly precludes acceptance of rental payments as constituting waiver of Shields's enforcement rights, Shields conclusively established all the elements of a forcible-detainer claim.

### D. Estoppel

■■■ As an alternative basis for affirming the judgment in his favor, Bradberry argues Shields is estopped from claiming Bradberry failed to extend the lease. Bradberry asserts he invested money in improving the leased premises based on agreements and representations that he would have the option to renew the lease for an extended period at a low rental rate. As evidence of detrimental reliance, he primarily cites the September 2011 letter in which he invoked the first of his lease-extension options and requested an additional five-year option period in contemplation of desired renovations.

■■■ The doctrines of waiver and estoppel are often raised together, but they are distinct and separate doctrines. Estoppel "prevents one party from misleading another to the other's detriment or to the misleading party's own benefit."[53] The elements of equitable estoppel are "(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations."[54]

Bradberry fails to identify any false representations or undisclosed material facts. The agreements and representations regarding a long-term lease at a low rental rate were consistent with Bradberry having a long-term lease if he exercised the option properly and paid the CPI-adjusted rent. And although Bradberry asked for an additional five-year option from 2027 to 2032 as he was considering a $30,000 renovation to add an "island style bar," nothing in the record indicates Shields responded to the request, granted it, or otherwise solicited the renovations. Bradberry proceeded with the proposed renovations after requesting a lease modification, but there is no evidence of any misleading representations that induced him to do so. Shields's knowledge of the improvements after their

---

**51.** *See In re Bank One, N.A.*, 216 S.W.3d 825, 826 (Tex. 2007) (orig. proceeding) ("We presume that 'a party who signs a contract knows its contents.'" (quoting *Cantella & Co. v. Goodwin*, 924 S.W.2d 943, 944 (Tex. 1996))).

**52.** *McCarty*, 165 S.W.3d at 353; *cf. In re Gen. Elec. Capital Corp.*, 203 S.W.3d 314, 316 (Tex. 2006) (orig. proceeding) (concluding General Electric did not waive its previously asserted contractual right by not complaining sooner, even though the "circumstances here may

indicate inattention or a certain lack of care on the part of General Electric," because no evidence of specific intent to waive its contractual right existed).

**53.** *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008).

**54.** *Id.* (quoting *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515-16 (Tex. 1998)).

completion does not constitute a misrepresentation on which Bradberry detrimentally relied. For these reasons, Shields prevails as a matter of law.[55]

### III. Conclusion

For the reasons stated, we reverse the court of appeals' judgment, render judgment that Shields has a superior right to immediate possession of the leased premises, and remand to the trial court to award attorney's fees in accordance with the parties' contract.

55. In light of this disposition, we need not consider whether Bradberry's estoppel defense is preserved for review, which Shields disputes.