

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00079-CV

_____

NATIONAL ASSOCIATION FOR LEGAL GUN DEFENSE, LLC, Appellant

V.

GLENN HENSLEY, Appellee

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-300494-18

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant National Association for Legal Gun Defense, LLC (NALGD), complains of the trial court's judgment for Appellee Glenn Hensley in a dispute over whether NALGD was obligated to pay Hensley's attorney's fees under a self-defense liability coverage agreement between the parties. In its sole issue, NALGD challenges the trial court's judgment by arguing that the agreement was inapplicable because (1) Hensley was not acting in self-defense and (2) Hensley did not protect himself with a covered weapon. We affirm.

## I. Background

### A. Pre-Trial Background

NALGD is a membership organization that promises to cover the legal fees of any member who faces criminal or civil action related to an incident wherein that member used a weapon in self-defense. Hensley became a member of NALGD in 2014 after he became involved in "First Amendment audits"—organized gatherings of photographers and others who videotape from public spaces for the purpose of educating people of their right to do so. At one such audit in California on December 7, 2017, Hensley was involved in an altercation with a Church of Scientology security guard. The altercation led to Hensley's arrest,[1] initially for the California offense of

---

[1]It is undisputed that Hensley was a member of NALGD at the time of his arrest in 2017.

grand theft person, which was later upgraded to the more serious offense of felony robbery.

In the days following his arrest, Hensley sought and obtained approval from NALGD to cover his legal expenses under the liability coverage agreement. However, after NALGD later refused to pay for his attorney's fees, Hensley filed suit, bringing claims for violations of the Texas Deceptive Trade Practices Act, negligent misrepresentation, breach of contract, and, alternatively, promissory estoppel. The case was tried to the bench in December 2020.

## B. Relevant Terms of the Self-Defense Liability Coverage Agreement

The terms of the agreement effective at the time of Hensley's arrest provided that NALGD would "defend and assist its members for the use of force to counter an immediate threat of violence or a countermeasure that involve[d] defending oneself or the well-being of another from physical harm by the use of[] any type, kind, or make of" a delineated list of weapons.[2] Specifically, the agreement provided unlimited coverage for attorney's fees and up to $1,000,000 of coverage per occurrence for various other legal expenses such as bail bonds, travel, and trial costs.

---

[2]The list of covered weapons included not only items such as firearms and knives, but also included "any other object used in self-defense, such as but not limited to, walking cane, stick[,] stone, etc.," "Martial Arts," or "any other tool or device commonly used or carried in or on a law enforcement officer[']s utility belt . . . ."

## C. Hensley's Testimony

Hensley testified that he travelled in December 2017 to the Hollywood, California location of the Church of Scientology to perform a First Amendment audit. As his group filmed on a sidewalk outside of the church, a security guard emerged from the church and told them to leave. Hensley and the security guard exchanged "words," and both became upset. According to Hensley, the security guard "became extremely aggressive," stepped to within inches of him, and pulled out a flashlight. With the flashlight near his face and "blind[ing]" him, Hensley "felt like [he] was about to be harmed," so he pulled the flashlight down. According to Hensley, the flashlight then "came out of" the guard's hand, and as Hensley turned to separate himself from the guard, the guard tackled Hensley from behind and slammed him into a car.[3]

Hensley said that he called NALGD's director, Larry Keilberg, on December 8, the day following his arrest, to inquire whether NALGD would cover his legal expenses related to the incident, and Keilberg asked Hensley to email him a video of the altercation for his review. The following day, after Hensley emailed the video, he received a response from Keilberg indicating that NALGD would cover the fees:

> OK [NALGD] will wright [sic] you a check for $3,000.00 for you to pay your attorney. We will need an attorney invoice or payment agreement before we can send you a check. Send a copy of the bail bond you paid.

---

[3]The guard released Hensley when another man from Hensley's group began fighting with the guard.

[NALGD] needs permission to post [your] video on our website and a testimonial from you . . . .

Shortly thereafter, Keilberg emailed Hensley again, informing him that Hensley was "clearly on public property and within [his] rights" during the incident but that NALGD could not post the video on their website due to profanity contained therein. NALGD issued a $3,000 reimbursement check[4] to Hensley for "attorney Hemming"[5] dated January 2, 2018.

According to Hensley, after his charges were upgraded, Keilberg told him that it was in Hensley's "best interest" to find another attorney and that Keilberg assured him that NALGD would cover the fees for the new attorney. At trial, Hensley read into evidence a text message from late February 2018, wherein Keilberg advised Hensley to find a new attorney.

Hensley took Keilberg's advice and contacted another attorney—Lisa Houlé—who quoted an initial retainer fee of $100,000 and an additional $75,000 fee should Hensley's case proceed to trial. Hensley testified that he spoke with Keilberg about Houlé's possible representation and that after Keilberg also spoke with Houlé he told

---

[4]NALGD's custom was to have its members pay their respective costs and fees and then NALGD would reimburse the member for those expenses.

[5]Krista Hemming was Hensley's first attorney. She charged an initial flat fee of $3,000, but after Hensley's charges were upgraded, she emailed an updated invoice directly to Keilberg for $15,000. On March 4, Keilberg emailed Hemming informing her that Hensley had decided to hire another attorney: "Glen Hensley has hired another attorney . . . There is nothing [NALGD] can do about the decision of Glenn [sic]. [NALGD] only pays. In this case we reimburse Glen."

Hensley to proceed with hiring her. According to Hensley, Keilberg said that Houlé's fee was not unreasonable, given the charge.

According to Hensley, Houlé later notified him that she had spoken with Keilberg and that Keilberg "had agreed to pay her retainer and that [Hensley] was to pay her and that [he] would be reimbursed."[6] Accordingly, he and Houlé entered into a fee agreement and Hensley ultimately paid $125,000 to her for representation.[7] Hensley testified that he relied on Keilberg's promise to pay Houlé's fee when he hired Houlé and that but for Keilberg's promise he would not have hired Houlé because he could not have otherwise afforded her fee.

### D. Houlé's Testimony

Houlé testified by deposition that she spoke directly with Keilberg on March 1 or 2 of 2018 and that he assured her that NALGD would cover her $175,000 fees to represent Hensley:

> [Hensley's Trial Counsel:] What was discussed during that call?
>
> [Houlé:] Quite simply, the fact that [NALGD] was going to pay Mr. Hensley's legal fees. That was discussed directly between Mr.

---

[6]Though this statement may constitute hearsay, it was unobjected to and, thus, has probative value. *See* Tex. R. Evid. 802; *Tex. Com. Bank, Nat'l Ass'n v. New*, 3 S.W.3d 515, 517 (Tex. 1999).

[7]The record shows that Houlé's fee was paid through a series of checks which included one check for $20,000 from a Peter Dayton made payable directly to Ms. Houlé. Hensley explained that Dayton was a friend who had agreed to loan Hensley this sum to help with Houlé's fee.

Keilberg and I during that phone call. That essentially was what the phone call was about.

[Hensley's Trial Counsel:] Did Mr. Keilberg express any reservation about your retainer fee?

[Houlé:] No. In fact, quite the opposite. He said it appears that I have got more than enough experience to handle the case, and he understood my legal fee, and he understood why Mr. Hensley wanted me to represent him, and he said something to the effect of my experience and training was quite impressive.

….

[Hensley's Trial Counsel:] And just to be clear, Mr. Keilberg did say that [NALGD] would pay the full $175,000 retainer fee?

[Houlé:] He absolutely did.

Houlé also confirmed that Hensley had paid her $125,000 for representation.

### E. Keilberg's Testimony

Keilberg testified that he managed the day-to-day operations of NALGD and made all final decisions for the organization, aided sometimes by the advice of its general counsel. Keilberg admitted that on December 9 he viewed the video of the incident that Hensley had emailed him and agreed to reimburse Hensley the $3,000 fee for his original attorney. However, he stated that Hensley had misrepresented to him the altercation with the security guard and that, upon viewing additional videos and evidence of the incident, NALGD made the decision not to cover Hensley's attorney's fees.

7

Keilberg contended that because, in his opinion, Hensley was the aggressor who committed a robbery of the guard's flashlight, Hensley was not acting in self-defense so as to trigger NALGD's liability under the agreement. Keilberg denied that he ever made any promises to Hensley, and he claimed that he verbally informed Hensley on "roughly" January 4 that NALGD would not pay for his legal representation.

Keilberg acknowledged that he spoke with Houlé and confirmed to her that Hensley was a member of NALGD. When asked by Hensley's trial counsel whether he told Houlé that NALGD would pay for her fees, Keilberg initially testified that he could not recall whether he had told her that. However, on re-examination, when pressed by his attorney on this subject, Keilberg's memory became more clear:

> [NALGD's Trial Counsel]   And [Houlé] made a number of statements that were read into the record. Do you deny that those statements were made that you agreed to pay $175,000 for the legal defense of Mr. Hensley?
>
> [Keilberg]  I never agreed to her to – The only thing she asked me was, was [Hensley] a member and I said yes. And that's why the phone call was so brief.

8

### F. Trial Court's Judgment

The trial court found in favor of Hensley and signed a judgment awarding him $125,000 in actual damages. The judgment does not specify the grounds for recovery, and no findings of fact or conclusions of law were requested or filed.[8]

## II. Standard of Review

In a bench trial in which no findings of fact or conclusions of law are filed, the trial court's judgment implies all findings of fact necessary to support it. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). We must affirm the judgment if we can uphold it on any legal theory supported by the record. *Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766–67 (Tex. 2011); *Liberty Mut. Ins. v. Burk*, 295 S.W.3d 771, 777 (Tex. App.—Fort Worth 2009, no pet.). "If there is some evidence to support the judgment, it must stand, and only that evidence most favorable to the issue is to be considered." *Lemons v. EMW Mfg. Co.*, 747 S.W.2d 372, 373 (Tex. 1988). Further, "[i]f an independent ground would fully support the complained-of ruling or judgment, but the appellant assigns no error to that independent ground, we must accept the validity of that unchallenged independent ground, and any error in the

---

[8]In rendering its judgment orally, the trial court noted that it was finding for Hensley on his breach of contract claim and pointed out that NALGD had agreed to pay Hensley's fees even after receiving a video of the altercation and being aware of the facts and circumstances thereof. However, we cannot consider the trial court's comments to glean the basis for its ruling because they are not findings of fact or conclusions of law. *In re W.E.R.*, 669 S.W.2d 716, 716 (Tex. 1984); *Cnty. of Dallas v. Poston*, 104 S.W.3d 719, 722 (Tex. App.—Dallas 2003, no pet.).

9

grounds challenged on appeal is harmless." *Thomas v. Pugliese*, No. 02-18-00064-CV, 2019 WL 3024473, at \*5 (Tex. App.—Fort Worth July 11, 2019, no pet.) (mem. op.) (citing *Oliphant Fin. LLC v. Angiano*, 295 S.W.3d 422, 423–24 (Tex. App.—Dallas 2009, no pet.)).

## III. Discussion

### A. The Judgment Is Supported on Other Grounds

NALGD's only complaint on appeal challenges the trial court's judgment as improper under a breach of contract theory because, according to NALGD, Hensley's conduct during his altercation with the security guard was not covered by the agreement. We acknowledge the potential merit of this argument in light of the record before us. However, even assuming that NALGD is correct that it did not breach the agreement with Hensley, the law requires us to inquire further. We must determine if the judgment was supported on any other grounds. *Rosemond*, 331 S.W.3d at 766–67.

After reviewing the pleadings and the evidence, we hold that the judgment can be supported on the theory of promissory estoppel. *Lemons*, 747 S.W.2d at 373. And because NALGD assigned no error on this ground, we must accept the validity of the judgment. *Thomas*, 2019 WL 3024473, at \*5.

### B. Promissory Estoppel

While usually a defensive mechanism, promissory estoppel is also a recognized cause of action when a promisee relies on an otherwise unenforceable promise. *Severs*

10

*v. Mira Vista Homeowners Assoc.*, 559 S.W.3d 684, 701 (Tex. App.—Fort Worth 2018, pet. denied) (citing *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 133–34 (Tex. 2005) (orig. proceeding). While promissory estoppel is not available if "a valid contract between the parties covers the alleged promise," *id.* (quoting *El Paso Healthcare Sys., Ltd. v. Piping Rock Corp.*, 939 S.W.2d 695, 699 (Tex. App.—El Paso 1997, writ denied), "promissory estoppel will apply to a promise outside a contract," *Trevino & Assocs. Mech., L.P. v. Frost Nat'l Bank*, 400 S.W.3d 139, 146 (Tex. App.—Dallas 2013, no pet.). The elements of promissory estoppel are "(1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment." *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983). When a contract exists between the parties, the claimant must also prove that the promise on which it relied to its detriment was made outside of that contract. *See Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 656 (Tex. App.—Dallas 2015, no pet.) (affirming judgment for plaintiff on promissory estoppel claim where, even though a contract existed between the parties, the evidence supported the finding that defendant made an independent promise outside of the contract upon which plaintiff relied); *El Paso Healthcare Sys., Ltd.*, 939 S.W.2d at 699 (same).

### 1. A Promise Was Made Outside of the Agreement

NALGD takes the position that Hensley's actions related to the altercation with the security guard were *not* covered by the agreement and, in fact, were "well outside the [a]greement's terms." Thus, according to NALGD's own logic, if

11

NALGD made any promises to cover Hensley's related attorney's fees, they were necessarily made outside of that agreement.

There is ample evidence in this record that NALGD made multiple such promises over the course of nearly three months and even after Keilberg viewed video evidence of the December altercation:

- In a December 9 email, Keilberg told Hensley that NALGD would write him a $3,000 check for his first attorney;

- NALGD issued Hensley a $3,000 reimbursement check dated January 2;

- Keilberg told Hensley that it was in Hensley's best interest to find a more experienced attorney and assured him that NALGD would cover the new attorney's fees;

- In a late February 2018 text exchange, Keilberg instructed Hensley to find a new attorney before proceeding with firing his first attorney;

- On March 1 or 2, Keilberg assured Houlé that NALGD would pay her fees to represent Hensley;

- After speaking with Houlé, Keilberg told Hensley to proceed with hiring her; and

- In a March 4 email, Keilberg informed Hensley's first attorney that Hensley had hired new counsel and explained that NALGD's role in Hensley's case was merely to "reimburse [Hensley]."

Because this evidence is sufficient to prove that NALGD made promises outside of the agreement to Hensley that it would pay for his attorney's fees, Hensley satisfied the first promissory estoppel element. *See El Paso Healthcare Sys., Ltd.*, 939 S.W.2d at 699.

12

## 2. It Was Foreseeable That Hensley Would Rely on NALGD's Promises

Starting the day after the altercation, Hensley repeatedly communicated with Keilberg about NALGD covering his attorney's fees. Further, both of Hensley's attorneys contacted Keilberg seeking either payment or assurance of payment from NALGD, and Keilberg himself encouraged Hensley to hire a new attorney. We hold that this constituted at least some record evidence that it was foreseeable to NALGD that Hensley would rely on its promises to pay his fees.

## 3. Hensley Substantially Relied on NALGD's Promises to His Detriment

Both documentary and testimonial evidence shows that Houlé was paid $125,000 for her representation of Hensley. Hensley testified that he could not afford Houlé's fee and that he indebted himself to a friend to help pay her fee in anticipation that NALGD would provide a reimbursement. Further, only after Hensley and Houlé received assurances of coverage from Keilberg did Hensley enter into the fee agreement with Houlé. We hold that this constituted at least some record evidence that Hensley relied to his detriment on NALGD's promise to cover his attorney's fees.

## IV. Conclusion

Because NALGD failed to raise a challenge that the judgment was not supported under a theory of promissory estoppel and because we hold that the record

contains some evidence to support the judgment on promissory estoppel grounds, we affirm.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: February 24, 2022