

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00036-CV

_____

IN THE INTEREST OF L.E. AND P.E., CHILDREN

On Appeal from the 322nd District Court
Tarrant County, Texas
Trial Court No. 322-727064-22

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

L.V. (Mother) appeals from the trial court's final order appointing C.E. (Father) as the sole managing conservator of their two children, L.E. (Lisa) and P.E. (Penny), and appointing Mother as the children's possessory conservator.[1] In this ultra-accelerated appeal,[2] Mother argues in two points that the trial court abused its discretion by (1) appointing Father as the children's sole managing conservator because he has a history of domestic violence against Mother and (2) failing to appoint her as a joint managing conservator because the evidence was insufficient to overcome the presumption that naming both parents as such was in the children's best interest. Because the trial court did not abuse its discretion, we will affirm.

## I. Background

In November 2022, Mother and Father were unmarried but lived together with then-three-year-old Lisa and then-two-year-old Penny. On November 25, 2022, Father physically assaulted Mother in front of the children during an altercation in their home. Mother called the police, and Father was arrested. During his arrest,

---

[1]We refer to the children using aliases and to other family members by their initials or by their relationship to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]The Department of Family and Protective Services instituted this case. *See* Tex. R. Jud. Admin. 6.2(a), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. F app. (requiring appellate court to dispose of appeal from judgment in a suit for termination of the parent–child relationship or a suit affecting the parent–child relationship filed by a governmental entity for managing conservatorship, so far as reasonably possible, within 180 days after notice of appeal is filed).

Father "informed Fort Worth PD that CPS needed to be notified due to [Mother's] being high on methamphetamines."

Because of Father's assaulting Mother, the Department of Family and Protective Services "received a referral alleging neglectful supervision of [Lisa and Penny] by [Father]" and thus opened an investigation. During the investigation, Mother refused the Department's requests that she drug test, and Mother's probation officer reported to a Department investigator that Mother had tested positive for amphetamines and methamphetamines.[3] Concerned for the children's safety, the Department sued for conservatorship of the children and to terminate Mother's and Father's parental rights to them.

On December 9, 2022, the trial court signed an order appointing the Department as the children's temporary managing conservator. The Department removed the children and placed them with B.G.—Father's brother's wife's cousin—in Springtown. Each parent countersued for sole managing conservatorship of the children, alleging that it would not be in the children's best interest for the parents to be appointed as joint managing conservators.

After the children's removal, the Department created a service plan for each parent. Based on Father's diligence in completing his service plan and his positive and productive interactions with the children during supervised visitation sessions, the

---

[3]At the time, Mother was on probation for an assault-causing-bodily-injury offense.

3

Department moved for the children's monitored return to Father. On September 7, 2023, the trial court granted the motion; returned the children to Father; ordered the Department to monitor the placement to ensure the children's safety; set the case for trial on December 18, 2023; and extended the statutory dismissal deadline to March 5, 2024. *See generally* Tex. Fam. Code Ann. §§ 263.401, .403.

The case was tried to the bench as scheduled on December 18, 2023. By that time, Lisa and Penny were four and three years old, respectively, and they had been with Father on a monitored return for over three months. The Department no longer sought termination of Mother's and Father's parental rights but asked the trial court to appoint Father as the children's sole managing conservator and Mother as possessory conservator with supervised visits with the children. The children's attorney and guardian ad litem agreed with the Department's recommendation.

At trial, the trial court heard testimony from Joan Hall, the case's current permanency specialist, and from Mother and Father.[4] Hall, who took over the case in July 2023, testified that the children were removed from the parents and came into the Department's care in December 2022 because of the domestic-violence incident

---

[4]The trial court took judicial notice of several documents in its file. "A trial court may take judicial notice of its own records in matters that are generally known, easily proven, and not reasonably disputed." *In re J.E.H.*, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.). A trial court may not, however, take judicial notice of the truth of allegations in its records. *See id.* (holding trial court could not take judicial notice of allegations caseworker made in family service plan or in affidavit attached to the Department's petition).

between Mother and Father and because of Mother's testing positive for methamphetamines during the Department's investigation. Hall also testified about the Department's service plans for both parents. Father's plan required him to attend scheduled visitations with the children and to complete parenting classes, a FOCUS for Fathers class,[5] individual counseling to address domestic-violence issues, and a psychological evaluation. Mother's plan similarly required her to attend scheduled visitations with the children and to complete parenting classes, a FOCUS for Mothers class, individual counseling, a drug assessment, drug treatment, random drug testing, domestic-violence classes, and a psychological evaluation.

Father had completed all his service-plan requirements. Mother had not. Although Mother had completed the required parenting classes, domestic-violence classes, and psychological evaluation, she had failed to complete the FOCUS for Mothers class and to make significant progress with individual counseling. Mother had been close to completing the FOCUS class but was arrested before she could finish, and when she was released from jail, the FOCUS program required her to restart the classes. Because Mother did not have enough time to complete the FOCUS class before trial, Hall told her to concentrate on individual counseling and drug treatment.

---

[5]FOCUS, a ten-week-long-program, stands for Families Offering Children Unfailing Support.

Mother had completed a drug assessment, but after she tested positive for drugs in August 2023, Hall asked her to take another assessment. Mother failed to do so. Hall was concerned that Mother was continuing to use drugs. Mother had been unable to demonstrate to Hall that she had stopped using methamphetamines and that she had substantially started the methamphetamine-recovery process. According to Hall, it was possible that Mother's methamphetamine use had worsened during the case's pendency. Hall thought that Mother would "really benefit" from an inpatient drug-treatment program but understood that Mother had to work and needed to maintain her residence. Hall opined that at a minimum, Mother needed to participate in an outpatient drug-treatment program.

Hall further testified that Mother had weekly, hour-long supervised visits with the girls. Mother dependably attended the visits when she "actually had the ability to be present." Hall had observed Mother's visits, which went well in Hall's opinion. The girls wanted to see Mother, and Mother was "very interactive" with them. According to Hall, Mother "gets on their level and plays with them in age-appropriate ways, . . . is physically affectionate towards them[,] and tells them she loves them." The Department recommended that Mother have continued supervised visitation with the girls.

Hall believed that Lisa and Penny were safe in their current placement with Father. Father had moved in with B.G., the girls' primary placement before the trial court had granted the monitored return. The girls had struggled with defiance and

6

behavioral issues when they were first placed with B.G. but had improved in recent months due to B.G.'s implementing the girls' play therapist's recommendations.

Hall described Lisa and Penny as "very sweet little girls." Lisa was in pre-kindergarten and was "doing well in school." Penny attended a part-time Mother's Day Out program. Both girls were "doing pretty well" according to Hall.

Both girls were bonded with Father and were doing well in his care. Hall described Father as "very cooperative." During the monitored return, he had maintained contact with her and had allowed her to see the home and talk to the girls during her weekly—and after 90 days, biweekly—visits to the home. Hall believed that Father was able meet the girls' needs and that placement with Father was in their best interest. The Department thus recommended that Father be appointed as the girls' sole managing conservator.

Mother disagreed, primarily because of the November 2022 domestic-violence incident. According to her, Father "brutally beat [her] up" in front of the girls for an hour and a half on the night of November 25, 2022. She recounted that Father pushed a kitchen table into her, repeatedly slammed her into a wall, pinned her against a wall and choked her, bashed her head into a door, hit her, threw something at her, kicked her in the back, and threw her and Lisa "out [of] the garage, causing [them] to fall." At that point, Penny ran back into the house and was "basically taken hostage" by Father. When Father finally emerged from the home holding Penny, "the house was surrounded [by] officers at gunpoint."

Mother also testified that she had witnessed violence between Father and the girls. According to her, Father would discipline them by spanking them with a belt and that she had to intervene multiple times "between him trying to spank [Lisa] with a belt and telling him to calm down." She described an incident in which Lisa "bust[ed] her head open" because Penny had pushed over a small slide that the girls were playing on, and Father tried to "rip" Penny out of Mother's hands to spank her for pushing the slide over. Mother recounted another instance when she returned home from "weekend jail . . . for probation" to find a bruise on Lisa's back.

Mother insisted that Father was not a bad father, but she was worried that he did not have his anger issues under control. She believed that even though Father had completed his service plan, "he did the bare minimum of what he needed to do to get by to -- to get his part [of the case] closed," and she did not "think that he ha[d] any remorse for any of his actions." She thus asked the trial court to award her primary custody of the girls.

Mother admitted that, unlike Father, she had failed to complete her service plan, specifically the FOCUS for Mothers class, individual counseling, and drug treatment. She explained that she had four FOCUS classes remaining when she was arrested and that she had restarted the course when she was released from the Parker County jail. Since her release, she had completed four individual counseling sessions but had not attended counseling recently because of work and other family issues. Mother further explained that she was arrested before she could start her drug-

treatment program. She was discharged from that program because of her arrest. After her release, she claimed that she completed another drug assessment but was not able to start her treatment program because the Department did not provide the necessary referral.

Mother insisted that she did not use methamphetamines and stated that she had been sober since May 2022. When asked why she had "tested positive for methamphetamines on multiple occasions in this case," she replied, "Because I have an inhaler, that will do that. That will cause a false positive." She maintained that her inhaler could cause "false positives" and that despite her positive drug tests, she did not use methamphetamines. She was concerned that she was testing positive for methamphetamines and understood that the Department would not want to return children to a parent who was testing positive for the substance, "if it was actually true or happening, but [she was] not on drugs."

Mother admitted, however, that she had been arrested twice during the case's pendency. First, she was arrested "[f]or a probation violation for not reporting." She explained that she was on probation for 18 months for an assault-causing-bodily-injury charge. Her second arrest was for theft and methamphetamine possession. She contended that she "was arrested for stealing [her] own car that [she had] proven that [she] didn't steal" and that the methamphetamine was not hers and "was not on [her]."

Despite her two arrests, Mother had been employed by a home-healthcare company since September 2023.[6] At the time of trial, she was working at least 40 hours a week and worked Mondays, Wednesdays, Fridays, and weekends. Mother testified that her employer was willing to rearrange her work schedule so that she was not working on weekends and that she would set up daycare for the girls on weekdays if they were returned to her.

Mother claimed that she would allow the girls to finish out the school year in Springtown and that she would be able to transport them to their respective schools there. At the time of trial, Mother was living in her best friend Morgan's father's four-bedroom, two-bath home in Benbrook with Morgan, Morgan's son, and Morgan's father. Mother explained that she was temporarily living there while she was "waiting on [her] apartment to come back available." She planned on moving into that apartment, which is in Fort Worth, by January 1, 2024. Until then, she and the girls would share a room at Morgan's father's house.

Father, however, was concerned about Morgan because she had a "CPS history," a criminal history, and a history of methamphetamine use. Drug use—specifically methamphetamine use—was also Father's primary concern with Mother. As Father explained, "with the drug use, there's no telling who she's getting drugs

---

[6]Mother testified that she is a certified nurse aid (CNA) and was "transitioning" into a licensed vocational nurse (LVN).

from or who she has around when she's using drugs and then, obviously, the concern that the kids could come into contact with said drugs or the paraphernalia."

Although Father was concerned about Mother's methamphetamine use, he had never seen her use methamphetamines. But shortly after Lisa was born in February 2019, Father learned that Mother had tested positive for methamphetamines during the pregnancy. Mother told Father that she had tested positive because "she went to the emergency room, and they gave her a prescription drug, and that information wasn't relayed to her OB/GYN, and the OB/GYN [was] the one that tested." Father testified that he gave Mother "the benefit of the doubt" at the time.

Before the November 2022 assault, Mother was a stay-at-home mom who occasionally worked, and Father worked fulltime. Mother was the girls' primary caregiver. Father started to become concerned because Lisa's teeth were rotting, and Mother would not take her to dentist. Father was also concerned because Mother would leave the house at odd hours of the night while he was asleep and because when he would come home from work "she would just be [going] 90 to nothing."

Father explained that he had assaulted Mother because of her behavior:

Her lying, . . . her constant accusations of me lying, . . . [her] not taking care of my children, and she was clearly high on meth that night, and that's why CPS was involved because whenever I was escorted to Tarrant County jail, I informed Fort Worth PD that CPS needed to be notified due to her being high on methamphetamines.

Father testified that he "wouldn't say [he] beat [Mother] up" and characterized the assault as an altercation. He denied choking Mother. But he admitted that he held her

11

up against a wall, he told her to get out of his house, and he pushed her toward the door to get her out of the house. He further admitted that law-enforcement officers had to order him out of the house at gunpoint.

Father pleaded guilty to assault and is on probation for the offense until June 2025. Father testified that he had taken accountability for the assault, reasoning that he "had a one-off and got mad at [Mother] and reacted." He denied having an anger problem and stated that he thought his actions the night of the assault were justified. He denied needing to take the anger-management classes that were a part of his service plan but testified that they had helped him become a better parent to the girls. For example, he had physically disciplined the girls in the past[7] because "that's how [he] was raised . . . but taking parenting classes ha[d] taught [him] to be a better parent." He no longer physically disciplines them. He further explained that

> the classes I have attended have made me think before I act now, um, and it really -- like, you can get frustrated real easily about different things, and now I blow everything off and just let it be, and then I think about the end result instead of in the moment right then and there.

Father testified that he and the girls live with B.G. in Springtown. He and the girls have a close relationship—Lisa is a "daddy's girl," and Penny is "all about daddy." From Father's perspective, the girls are "doing fantastic." Lisa was doing

---

[7]In contrast to Mother's testimony, Father denied ever having spanked the girls with a belt or seeing a bruise on Lisa when Mother had returned from weekend jail. In recounting that incident, he admitted that while Mother was away, he had given Lisa "a single pop on the butt and nothing further" because she had "pour[ed] a bunch of water in the windowsill."

12

"real well now" in prekindergarten,[8] and Penny was enjoying going to her Mother's Day Out program twice a week, playing with kids her age there, and "learning her alphabets, colors, [and] numbers."

Father takes the girls to the doctor and the dentist when needed, and he had recently attended an Admission, Review, and Dismissal (ARD) meeting for Lisa to discuss speech-therapy-study and autism-study results. Father testified that his "work schedule can be built around the kids" because his boss works with his "schedule when it comes to the kids" and has no problem letting Father off from work when needed.

Father testified that he can provide Lisa and Penny with a permanent, stable home environment going forward. He explained that

> We will be living with [B.G.] . . . [T]he house is paid for, so we don't have a mortgage. . . . [A]ll utilities are paid, plenty of food in the house. . . . I come home from work, and it's activities with the kids, cook dinner, bathtime, [and] bedtime.

Father asked the trial court to appoint him as the girls' sole managing conservator because he believed that the appointment was in the girls' best interest at the time of trial. He also asked the trial court to allow Mother to have continued supervised visitation with them. Father testified that the girls love Mother and that she should be in their lives, but in his opinion, Mother's visits with the girls should be

---

[8]Lisa had initially resisted participating in physical-education classes but now looks forward to them.

supervised for their safety. Father wants the girls to have a relationship with Mother, and if she "was able to go through treatment and provide clean drug tests, [he] would be okay with unsupervised visits at that time."

After the trial, the trial court signed a final order (1) removing the Department as Lisa's and Penny's managing conservator; (2) appointing Father as the girls' sole managing conservator and finding that the appointment was in the girls' best interest; and (3) appointing Mother as the girls' possessory conservator and finding that the appointment was in the girls' best interest. The trial court further found that Mother's "possession and access shall be as provided by this order" and "does not exceed the restrictions needed to protect the best interest of the children." The trial court ordered that Mother "shall have possession and access two times per month as arranged, supervised, and directed by Family Court Services (FCS) or another supervisor designated by . . . Father. The parties may agree to more visits per month through a supervisor designated by . . . Father." The trial court specifically prohibited both parents from using "corporal punishment" on the girls.

Mother timely appealed and raises two points challenging the trial court's conservatorship determinations.

## II. Standard of Review

Here, none of the parties requested—and the trial court did not file—findings of fact and conclusions of law. In a trial to the court in which no findings of fact or conclusions of law are filed, the trial court's judgment implies all findings of fact

necessary to support it. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). When a reporter's record is filed, these implied findings are not conclusive, and an appellant may challenge them by raising issues challenging the legal and factual sufficiency of the evidence to support the judgment. *Id.* We apply the same standard when reviewing the sufficiency of the evidence to support implied findings that we use to review the evidentiary sufficiency of jury findings or a trial court's express findings of fact. *Id.* We must affirm the judgment if we can uphold it on any legal theory supported by the record. *Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766–67 (Tex. 2011).

We review a trial court's decisions regarding the conservatorship of a child under an abuse-of-discretion standard. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re M.L.*, No. 02-15-00258-CV, 2016 WL 3655190, at *3 (Tex. App.—Fort Worth July 7, 2016, no pet.) (mem. op.). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). A trial court also abuses its discretion if it does not analyze or apply the law properly. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011).

In an abuse-of-discretion review, legal and factual sufficiency are not independent grounds of error, but they are relevant factors in deciding whether the trial court abused its discretion in a conservatorship case. *See M.L.*, 2016 WL 3655190, at *3. In applying the abuse-of-discretion standard, we use a two-pronged analysis:

15

(1) whether the trial court had sufficient evidence upon which to exercise its discretion and (2) whether the trial court erred in applying its discretion. *Id.*; *see Wise Elec. Coop., Inc. v. Am. Hat Co.*, 476 S.W.3d 671, 679–80 (Tex. App.—Fort Worth 2015, no pet.) (setting forth standards for legal and factual sufficiency).

### III. The Trial Court's Conservatorship Findings

A trial court may appoint a sole managing conservator or joint managing conservators. Tex. Fam. Code Ann. § 153.005(a). It is a rebuttable presumption that the appointment of the child's parents as joint managing conservators is in the child's best interest. *Id.* § 153.131(b). A finding of a history of family violence involving the child's parents removes this presumption. *Id.* The child's best interest is always a trial court's primary consideration in determining conservatorship and possession and access issues. *Id.* § 153.002.

In Mother's first point, she contends that the trial court abused its discretion by appointing Father as sole managing conservator because he had a history of domestic violence against Mother. She further contends that the trial court abused its discretion by failing to find a history of family violence—which would have removed the presumption that appointing both parents as the girls' joint managing conservators was in their best interest—and by not appointing her as sole managing conservator.

When a trial court determines whether to appoint a party as a child's sole or joint managing conservator, the court must consider evidence of the intentional use of abusive physical force by a party directed against the party's spouse, the child's parent,

16

or any person younger than 18 committed within the two years before suit was filed or during the suit's pendency. *Id.* § 153.004(a). When there has been a history or pattern of physical or sexual abuse by one parent against the other parent, the Family Code prohibits a trial court from appointing joint managing conservators and creates a rebuttable presumption that it is not in the child's best interest for an abusive parent to be appointed sole managing conservator:

> The court may not appoint joint managing conservators if credible evidence is presented of a history or pattern of past or present . . . physical or sexual abuse by one parent directed against the other parent . . . . It is a rebuttable presumption that the appointment of a parent as the sole managing conservator of a child or as the conservator who has the exclusive right to determine the primary residence of a child is not in the best interest of the child if credible evidence is presented of a history or pattern of past or present . . . physical or sexual abuse by that parent directed against the other parent . . . .

*Id.* § 153.004(b).

Mother argues that the testimony about the November 2022 assault constituted credible evidence of a history or pattern of past physical abuse by Father directed against Mother. She claims that this evidence precluded the trial court from appointing Father as the girls' sole managing conservator under Family Code Section 153.004(b). *See id.*

The Family Code does not define "history" or "pattern." *See id.* § 153.004; *Hinojosa v. Hinojosa*, No. 14-11-00989-CV, 2013 WL 1437718, *4 (Tex. App.— Houston [14th Dist.] Apr. 9, 2013, no pet.) (mem. op.). As Mother points out, a single

17

act of violence or abuse can suffice to show a history of physical abuse under Section 153.004(b). *See Baker v. Baker*, 469 S.W.3d 269, 274 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (citing *Dewalt v. Dewalt*, No. 14-06-00938-CV, 2008 WL 1747481, at *4 (Tex. App.—Houston [14th Dist.] Apr. 17, 2008, no pet.) (mem. op.)); *In re R.T.H.*, 175 S.W.3d 519, 521 (Tex. App.—Fort Worth 2005, no pet.) (citing *In re Marriage of Stein*, 153 S.W.3d 485, 489 (Tex. App.—Amarillo 2004, no pet.)). But even so, a single incident of physical abuse is not automatically a history of physical abuse. *See C.C. v. L.C.*, No. 02-18-00425-CV, 2019 WL 2865294, at *12 (Tex. App.—Fort Worth July 3, 2019, no pet.) (mem. op.). Rather, "the statute leaves it to the trial court's broad discretion to decide whether the act reaches the threshold of being a history." *Id.* "[A] single act, even if its occurrence is undisputed, does not necessarily mandate a finding that a history of abuse exists." *Id.* at *17.

Here, Father assaulted Mother in November 2022. He admitted to the assault at trial and testified that he had pleaded guilty and was on probation for the offense until June 2025. Even so, the trial court was within its broad discretion to conclude that there was no credible evidence of a *history* or *pattern* of Father's physically abusing Mother because no evidence showed that Father had assaulted Mother before or after the November 2022 assault and because Father described the assault as a "one-off." *See id.* at *12. Although the assault was undisputed, the trial court was not required to find that a history of abuse or family violence exists. *See id.* at *17.

18

But even if the trial court did abuse its discretion by failing to determine that Father's assaulting Mother in November 2022 was credible evidence of a history or pattern of physical abuse or family violence, such a finding would not have prohibited the trial court from appointing Father as the girls' sole managing conservator. Although a family-violence finding removes the joint-managing-conservators presumption and Section 153.004(b) prohibits a trial court from appointing the parents as joint managing conservators if there is credible evidence of a history or pattern of physical abuse by one parent against another, the abusive parent is not rendered ineligible to be named sole managing conservator. *See* Tex. Fam. Code Ann. § 153.004(b); *see also Baker*, 469 S.W.3d at 276 (stating that father was not rendered ineligible to be named sole managing conservator even though mother proved that he had a history of being physically abusive against her). Rather, Section 153.004(b) creates a presumption that it is not in a child's best interest for a parent with a history of physical abuse to be appointed sole managing conservator. *See* Tex. Fam. Code Ann. § 153.004(b); *In re J.M.*, No. 02-16-00428-CV, 2017 WL 3821863, at *5 (Tex. App.—Fort Worth Aug. 31, 2017, no pet.) (mem. op.). But that presumption is rebuttable. *See* Tex. Fam. Code Ann. § 153.004(b); *J.M.*, 2017 WL 3821863, at *5.

Here, although Father had assaulted Mother in November 2022, Father successfully completed his service plan, which included domestic-violence classes, parenting classes, and individual counseling. Father's completing his plan led the Department to ask for the children's monitored return to Father. The girls were

19

successfully returned to him on a monitored basis for three months, and the evidence showed that Father could care for their physical and emotional needs and provide them with safety and stability. Mother, however, failed to demonstrate safety and stability: she still struggled with methamphetamine addiction, was temporarily living in Morgan's father's home, and had been arrested twice during the case's pendency. This evidence sufficed to overcome the presumption that it was not in the girls' best interest for Father to be appointed sole managing conservator, and a preponderance of the evidence supported the trial court's opposite finding. *See* Tex. Fam. Code Ann. § 105.005. We therefore hold that the trial court did not abuse its discretion by appointing Father sole managing conservator. We overrule Mother's first point.

In her second point, Mother alternatively argues that the trial court abused its discretion by not appointing her as joint managing conservator because the evidence was insufficient to overcome the presumption that naming both parents as such was in the girls' best interest.

As noted, it is a rebuttable presumption that the appointment of the child's parents as joint managing conservators is in the child's best interest. *Id.* § 153.131(b). When, as here, an agreed parenting plan is not filed with the trial court, the court may appoint both parents joint managing conservators only if the appointment is in the child's best interest, considering the following factors:

> (1) whether the physical, psychological, or emotional needs and development of the child will benefit from the appointment of joint managing conservators;

20

(2) the ability of the parents to give first priority to the welfare of the child and reach shared decisions in the child's best interest;

(3) whether each parent can encourage and accept a positive relationship between the child and the other parent;

(4) whether both parents participated in child rearing before the filing of the suit;

(5) the geographical proximity of the parents' residences;

(6) if the child is 12 years of age or older, the child's preference, if any, regarding the person to have the exclusive right to designate the primary residence of the child; and

(7) any other relevant factor.

*Id.* § 153.134(a).

Here, several factors weigh in favor of appointing both parents as joint managing conservators: both parents love and are bonded with the children, they have both completed parenting classes, Mother and Father each appear to be able to "encourage and accept a positive relationship" between the girls and the other parent, and the parents' homes are in relatively close geographic proximity. But Mother's continued drug use, recent arrests, and lack of housing stability weigh against appointing her as joint managing conservator.

As noted, Mother tested positive for methamphetamine while pregnant with Lisa, who was born in early 2019. According to Hall, Mother had continued to use methamphetamines throughout the case and had tested positive in August 2023. After that positive test, Mother failed to complete another drug assessment and failed to complete drug treatment. Hall was concerned that Mother was continuing to use

21

drugs because she had been unable to demonstrate to Hall that she had stopped using methamphetamines and that she had substantially started the methamphetamine-recovery process. Hall testified that in her opinion, Mother needed, at minimum, out-patient drug treatment. Father explained that he was concerned that Mother's drug use could expose the girls to drugs, drug users, and drug paraphernalia.

Although Mother had plans to move into an apartment, she was temporarily living in Morgan's father's house at the time of trial. Morgan had a "CPS history," a criminal history, and a history of methamphetamine use. Mother had also been arrested twice during the case. In contrast to Mother, Father offered a safe, more stable environment. The girls were successfully returned to him on a monitored return. At the time of trial, Father and the girls lived with G.H., who had been the girls' primary placement during the case. His testimony regarding his caring for the girls and their daily routine supported his assertion that he can provide Lisa and Penny with a permanent, stable home environment going forward. We thus conclude that this evidence sufficed to overcome the joint-managing-conservator presumption, and the preponderance of the evidence supported a finding that appointing Father as Lisa's and Penny's sole managing conservator was in their best interest. *See id.* § 105.005. We overrule Mother's second point.

## IV. Conclusion

Having overruled Mother's two points, we affirm the trial court's final order.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: May 23, 2024