

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00187-CV

_____

JOSEPH SAMUEL MCCREARY, III, Appellant/Cross-Appellee

V.

LAURA MCCREARY, Appellee/Cross-Appellant

On Appeal from the 481st District Court
Denton County, Texas
Trial Court No. 18-6047-211

Before Kerr, Wallach, and Walker, JJ
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

In this divorce case, Appellant/Cross-Appellee Joseph Samuel McCreary III complains that the trial court abused its discretion by awarding spousal maintenance to his ex-wife, Appellee/Cross-Appellant Laura McCreary. Laura complains that the trial court abused its discretion by admitting posttrial evidence on the amount of family-support arrearages and by awarding only $6,000 for those arrearages. We will reverse and render on the issue of spousal maintenance and affirm the remainder of the trial court's judgment.

## I. BACKGROUND

### A. PRETRIAL

Joseph and Laura were married in 2004 and have one child together, a teenaged son. In July 2018, they filed competing petitions for divorce.[1] The trial court entered temporary orders, which included a requirement that Joseph pay $1,000 in weekly interim "family support." The court further ordered Joseph to pay all costs associated with the child's education, extracurricular expenses, and unreimbursed healthcare costs as well as expenses related to the marital residence, all vehicles, Laura's insurance, and an equalization of attorney's fees.

---

[1]In her original counterpetition, Laura requested temporary orders for child support and spousal maintenance and a final award of child support, but she did not request a final award of spousal maintenance or support arrearages. She also alleged that Joseph had committed adultery and was guilty of treating her cruelly.

The litigation was lengthy and hostile, with Joseph alleging that Laura had repeatedly deprived him of visitation with their son. Due to her actions from various custody altercations with Joseph, Laura was charged in 2021 with the offenses of making a false report to a peace officer (a Class B misdemeanor) and interfering with child custody (a state jail felony). *See* Tex. Penal Code Ann. §§ 25.03 (interfering with child custody); 37.08 (making false report).[2] As the case progressed, the trial court issued numerous additional orders, including orders for writs of attachment for their son to be returned to Joseph, an October 2020 order abating Joseph's obligation to pay Laura the formerly ordered interim weekly family support and expenses because she had obtained full-time employment as a teacher, and an order for Laura to vacate the marital home so that Joseph could make extensive repairs to it.[3] The trial court also ordered in February 2021 that it would not hear any of Laura's "motions or requests for affirmative relief on temporary orders" until she returned their son to Joseph.[4]

---

[2]Before the divorce trial, Laura was convicted of the making-a-false-report charge, and we affirmed the trial court's judgment in that case. *See McCreary v. State,* 649 S.W.3d 902, 907 (Tex. App.—Fort Worth 2022, pet. ref'd). The interfering-with-child-custody charge was still pending at the time of the divorce trial, but it appears from that court's records that Laura later pleaded guilty to the lesser-included offense of harboring a runaway child, a Class A misdemeanor. *See* Tex. Penal Code § 25.06.

[3]After vacating the home, Laura and their son lived in a rental apartment for the pendency of the divorce.

[4]It is not clear from the record if or when this order was rescinded before trial.

## B. TRIAL

The case was tried to a jury in May 2022, at which Laura proceeded pro se.[5] Laura testified that she had a bachelor's degree and was certified in Texas as a special education teacher and behavioral therapist. When she and Joseph first married, Laura was teaching at a local school district. She quit that job when their son was born in 2006 and did not hold a job outside of the home until after the divorce was filed.

Laura testified that, in August 2020, she was hired as a special education teacher with Lewisville ISD. She resigned that position after a month due to "[s]tress from the divorce." However, she was assured that she could be rehired to the position after the divorce proceedings were finalized. Laura then secured a permanent substitute-teacher position with Southlake ISD but was let go after her background check showed her criminal charges. After that, she was hired to teach with Dallas ISD, but, once again, she lost the position due to the charges on her background check. Finally, Laura testified that she had been hired as a loan officer for a mortgage-origination company and had completed most of the training required for the position. But when she missed the final training test due to being "dr[agged] into court" for a divorce hearing, she was fired.

Laura testified that she could earn about $55,000 annually as a teacher and believed that she would have made "six figures" as a loan officer. She stated that, if

[5]Before trial, Laura had been represented by as many as ten different attorneys, but by the time of trial she had become unable to pay for representation.

4

she did not have to make a house payment, a teacher's salary would be enough to "keep the family up and going" in the absence of Joseph's income. In total, she had $5,420 in monthly expenses, which included $2,100 in rent for her apartment.

Additionally, Laura testified that she had taken over a business from her father selling products derived from emu oils. At the time of trial, the business was not generating much income—no more than $100 per week—but Laura stated that it was a "great passion" for her and that she hoped that it might one day support her financially. She had "lots of plans" for the business, which "revolve[d] around" being able to move back into the marital home as the business was "struggling because [she was] working out of an apartment."

Laura testified that she was physically healthy and that the only obstacles to her obtaining gainful employment were her pending criminal charges and the divorce proceedings. She also made it explicitly clear on multiple occasions that she sought an award of spousal maintenance (over no objection from Joseph), and Joseph cross-examined her extensively on the issue. She also testified that she was eligible for and desired to obtain state-paid health insurance for their son because Joseph's health plan was, in her opinion, subpar.

Joseph testified that the marital home was completely paid for and that he held two retirement accounts that were both subject to "pretty steep" tax penalties if liquidated early. He also testified—aided by a trial exhibit (Trial Exhibit 11)—concerning the amount of family support and other costs and expenses that he had

5

paid to Laura pursuant to the trial court's temporary orders. Trial Exhibit 11 showed that Joseph had paid a total of $336,777.48 to Laura, which included $42,410.33 for family support. Laura disputed these amounts, claiming that Joseph owed her "hundreds of thousands of dollars of child support."

In its verdict, the jury found that Joseph had committed adultery and had committed cruel treatment toward Laura. On the issue of support arrearages, the jury was asked whether it believed that there were "child[-]support arrearages,"[6] to which it answered, "Yes." It was not asked to determine the amount of those arrearages or to answer any questions related to spousal maintenance.[7] The jury also found that (1) the value of the marital home was $751,820.00, with $107,389.37 being Joseph's separate property; (2) the value of retirement account one was $488,142.98; and (3) the value of retirement account two was $78,753.73, with $21,579.59 being Joseph's separate property. Thus, taking into account Joseph's separate property, the jury found that the value of the relevant community property was as follows: $644,430.63 equity in the marital home, $488,142.98 in retirement account one, and $57,154.14 in retirement account two.

---

[6]Throughout the proceedings, Laura used the terms "family support" and "child support" seemingly to mean the same thing. At a post-trial status hearing, Joseph highlighted this issue and appeared to recommend that the trial court proceed under the assumption that Laura's request for child support arrearages was actually a request for the trial court to award arrearages for unpaid interim family support as ordered in the temporary orders.

[7]Neither party objected to the jury charge.

## C. POSTTRIAL

On July 21, 2022, the trial court entered a letter ruling on the verdict.[8]  After the issuance of the letter ruling, the parties continued to litigate various amounts to be awarded in the final decree, including the amounts for spousal maintenance[9] and support arrearages.  Laura filed her Motion for Rulings on Live Pleadings and Motion for Enforcement of Prior Court Orders (Motion for Rulings).  In the Motion for Rulings, Laura contended that there remained several live pretrial motions that still required the trial court's attention.  In those pretrial motions, Laura had requested sanctions and monetary relief, alleging that Joseph had violated the temporary orders by failing to pay the required interim family support and expenses.  Among other things, the Motion for Rulings asked the trial court to hear those pretrial motions and to "enter judgment" against Joseph in the amount of $70,589.67 for family-support arrearages.[10]

---

[8]A copy of the letter ruling is not in the appellate record.

[9]For example, Joseph filed his Petitioner's Legal Support Regarding Court's Improper Award of Spousal Maintenance to Respondent, in which he argued that Laura was not eligible for spousal maintenance; he did not argue therein that the issue had not been properly pleaded or tried by consent.

[10]The parties agree that Joseph's total obligation for the weekly interim family support payments was between $112,000 and $113,000.  Laura calculated her requested arrearages amount by subtracting $42,410.33 (the amount of family support that Joseph's Trial Exhibit 11 showed he had paid) from $113,000.

In April 2023, the trial court held a status hearing at which several issues were considered, including Laura's request to determine the amount of support arrearages. Joseph moved to enter additional evidence into the record showing the amount of temporary support and expenses he had paid (Posttrial Exhibit).[11] The trial court asked Laura if she objected to the exhibit's admission, to which Laura responded, "I'm not sure why we're submitting more evidence about what he's paid in child support." The trial court then ruled to admit the Posttrial Exhibit.

The Posttrial Exhibit contained 350 pages of bank statements showing that Joseph had made numerous additional support payments to Laura that were not reflected in Trial Exhibit 11. In total, the Posttrial Exhibit evidenced that Joseph had made approximately $106,000 in family-support payments either directly to Laura or through his attorney. Based on the Posttrial Exhibit, Joseph requested the trial court to determine that he owed $6,000 in support arrearages. No evidence was admitted to contest these amounts.

The final divorce decree ordered as follows:

- Laura received the marital home;

---

[11]It appears from the hearing transcript that the Posttrial Exhibit had been prepared by Joseph's attorney and provided to Laura's attorney (whom Laura had hired after trial but who was no longer representing her at the time of the hearing) prior to the hearing. Laura appeared at the hearing pro se and stated that she had not previously viewed the Posttrial Exhibit.

8

- Laura received 50% of both retirement accounts after deducting amounts owed to Joseph for his separate property;

- Joseph was to pay Laura $2,500 in monthly spousal maintenance for five years;

- Joseph was to pay Laura $1,840 in monthly child support;

- Joseph was to pay Laura $6,000 in family-support arrearages;

- Joseph was to pay Laura $345 in monthly cash medical support as additional child support if Laura obtained their son's health insurance through the State of Texas;

No findings of fact or conclusions of law were requested or filed related to the issues submitted to the trial court. Joseph appealed and Laura cross-appealed from the final divorce decree.

## II. STANDARD OF REVIEW

We apply the same standard of review—abuse of discretion—to both Joseph's and Laura's challenges. *See Sherman v. Sherman*, 650 S.W.3d 897, 899 (Tex. App.—Fort Worth 2022, no pet.) (spousal maintenance); *Beck v. Walker*, 154 S.W.3d 895, 901 (Tex. App.—Dallas 2005, no pet.) (arrearages).

The test for an abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but whether the court acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). In other words, the correct question is whether the ruling was arbitrary or unreasonable. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011); *Smithson v. Cessna Aircraft Co.*, 665 S.W.2d 439, 443

(Tex. 1984). The mere fact that a trial court decided a matter differently than a reviewing court would have does not demonstrate that an abuse of discretion has occurred. *Sw. Bell Tel. Co. v. Johnson*, 389 S.W.2d 645, 648 (Tex. 1965); *Garcia v. Garcia*, 170 S.W.3d 644, 649 (Tex. App.—El Paso 2005, no pet.).

Although a trial court does not abuse its discretion by deciding based on conflicting evidence, sufficient evidence must nevertheless support the decision; therefore, the traditional sufficiency-review standards are relevant to our review. *Hamilton v. Hamilton*, No. 02-19-00211-CV, 2020 WL 6498528, at *3 (Tex. App.—Fort Worth Nov. 5, 2020, no pet.) (mem. op.); *In re S.C.*, No. 02-17-00377-CV, 2018 WL 5289370, at *3 (Tex. App.—Fort Worth Oct. 25, 2018, no pet.) (mem. op.). Thus, when we review whether the trial court abused its discretion by ruling based on legally or factually insufficient evidence, "we must determine (1) whether the trial court had sufficient evidence on which to exercise its discretion and (2) whether the trial court acted reasonably in applying its discretion to those facts." *Hamilton*, 2020 WL 6498528, at *3.

When an issue is determined by the trial court (as were the issues of spousal maintenance and the amount of support arrearages here) and no findings of fact or conclusions of law are filed, the trial court's judgment implies all findings of fact necessary to support it. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). When a reporter's record is filed, these implied findings are not conclusive, and an appellant may challenge them by raising issues challenging the legal and factual

10

sufficiency of the evidence to support the judgment. *Id.* We apply the same standard when reviewing the sufficiency of the evidence to support implied findings that we use to review the evidentiary sufficiency of jury findings or a trial court's express findings of fact. *Id.*; *Liberty Mut. Ins. v. Burk*, 295 S.W.3d 771, 777 (Tex. App.—Fort Worth 2009, no pet.). We must affirm the judgment if we can uphold it on any legal theory supported by the record. *Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766–67 (Tex. 2011); *Liberty Mut.*, 295 S.W.3d at 777.

### III.  JOSEPH'S APPEAL

In a single issue, Joseph contends that the trial court abused its discretion in awarding spousal maintenance to Laura because (1) Laura did not plead a claim for spousal maintenance and the issue was not tried by consent and (2) the evidence was legally insufficient to prove her entitlement to spousal maintenance. Assuming without deciding that the issue was tried by consent, we will hold that the evidence was legally insufficient to support the implied finding that Laura lacked the ability to earn sufficient income to provide for her minimum reasonable needs.

### A.  RELEVANT LAW

Spousal maintenance is available only in "very narrow and very limited circumstances." *Dalton v. Dalton*, 551 S.W.3d 126, 130 (Tex. 2018) (internal quotations omitted). Its purpose is "to provide temporary and rehabilitative support for a spouse whose ability to support herself has eroded over time while engaged in homemaking

11

activities and whose capital assets are insufficient to provide support." *Sherman*, 650 S.W.3d at 899 (internal quotations omitted).

Section 8.051 of the Texas Family Code governs a spouse's eligibility for spousal maintenance. *See* Tex. Fam. Code Ann. § 8.051. As relevant here, a trial court may order spousal maintenance only if (1) "the spouse seeking maintenance will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs" and (2) the maintenance-seeking spouse "has been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs."[12] *Id.* § 8.051(2).

Neither the Family Code nor caselaw defines "minimum reasonable needs." *Martinez v. Martinez*, No. 02-21-00353-CV, 2022 WL 17986023, at *2 (Tex. App.—Fort Worth Dec. 29, 2022, no pet.) (mem. op.) (citing *Slicker v. Slicker*, 464 S.W.3d 850, 860 (Tex. App.—Dallas 2015, no pet.)). Rather, the trial court determines a spouse's minimum reasonable needs on a case-by-case, fact-specific basis. *Id.*

## B. ANALYSIS

Thus, to be eligible for spousal maintenance, Laura—as the requesting spouse—bore the burden of proving that (1) she would lack sufficient post-divorce

---

[12]Section 8.051 also provides that a spouse might be eligible for spousal maintenance if they are incapacitated due to physical or mental disability or are the custodian of a child of the marriage who is physically or mentally disabled. *See* Tex. Fam. Code Ann. § 8.051 (2). Neither of these provisions apply to this case.

property to provide for her minimum reasonable needs, (2) she and Joseph had been married for at least ten years, and (3) she lacked the ability to earn sufficient income to provide for her minimum reasonable needs. *See id.* There is no dispute that Laura and Joseph had been married for at least ten years, so our analysis will focus on the first and third requirements.

Joseph argues that Laura received ample property through the divorce decree—more than $1,000,000 from the marital home and retirement accounts—to meet her minimum reasonable needs. He also claims that she failed to prove her inability to earn sufficient income to provide for her needs in that she had a bachelor's degree and two certifications and had obtained a teaching position in recent years. In his view, Laura can claim neither divorce-related stress nor her criminal charges as obstacles to obtaining sufficient employment because the divorce has concluded and her criminal charges are the result of her own wrongdoing. Laura counters that she is not required to sell the marital home and retirement accounts to cover her needs because they are long-term, illiquid assets. Further, she contends that the evidence showed her inability to obtain sufficient employment: she had not been employed for most of the marriage, she had been forced to leave a job after a month of employment due to the stress of the divorce, and her pending criminal charges had made it "difficult if not impossible to again work in the education field."

We agree with Laura that she was not required to sell the home or to liquidate the retirement accounts to meet her burden to show that she lacked adequate post-

13

divorce property to cover her minimum needs. She was awarded the marital home (valued at $750,000) and half of the community-estate portions of the two retirement accounts (valued at approximately $272,000). Joseph testified that liquidating the retirement accounts early would incur "pretty steep" tax penalties. When considering assets awarded in a divorce, the law does not require a spouse to spend down or sell long-term assets such as homes and vehicles or to liquidate retirement accounts if doing so would incur substantial penalties or tax consequences. *Mehta v. Mehta*, No. 02-22-00069-CV, 2023 WL 3521901, at *8 (Tex. App.—Fort Worth May 18, 2023, pet. filed) (mem. op.).

We agree with Joseph, though, that the evidence was legally insufficient to show that Laura lacked the ability to earn a sufficient income to cover her minimum reasonable needs. Laura testified that she had $5,420 in minimum monthly needs,[13] which included $2,100 to pay for her apartment rent. Additionally, Laura was awarded $1,840 in monthly child support. Thus, having been awarded the marital home (which was paid off and had no monthly payment) and taking into account the child-support award, Laura's post-divorce minimum monthly reasonable needs were approximately $1,480. *See Mehta*, 2023 WL 3521901, at *8 (explaining that—in determining minimum reasonable needs—courts consider, among other things, awards of child-support payments).

---

[13]Joseph does not dispute the reasonableness of these amounts.

Laura has a bachelor's degree and is a certified teacher and certified behavioral therapist. She testified that, as a teacher, she could earn approximately $55,000 annually and that a teacher salary would be enough to "keep the family up and going" in the absence of having to make a monthly mortgage payment. The evidence showed that Laura had been able to obtain multiple teaching jobs (and also a job as a loan-officer trainee) within two years of trial, though she could not maintain any of this employment due to the burdens of the divorce proceedings and her criminal charges. Laura testified that she was physically healthy and did not point to any other obstacles to her obtaining gainful employment.

Because the divorce proceedings have ended, Laura's only perceived obstacle to earning gainful employment is her criminal charges. At the time of trial, she had been convicted of a Class-A misdemeanor for making a false report to a police officer and had a pending state-jail-felony for interfering with child custody. Laura testified that she could not obtain or keep a teaching job due to these charges appearing on her background check.

First, it is axiomatic in Texas that a person cannot derive a financial benefit from her own wrongdoing or criminal action. *Peeler v. Hughes & Luce*, 868 S.W.2d 823, 829 (Tex. App.—Dallas 1993) aff'd 909 S.W.2d 494 (Tex. 1995); *see Holder v. Garner, Lovell & Stein, P.C.*, No. 07-98-0175-CV, 1999 WL 642216, at *5 (Tex. App.—Amarillo Aug. 24, 1999, pet. denied) ("Public policy does bar one from reaping benefit from his illegal acts."); *Ovalle v. Ovalle*, 604 S.W.2d 526, 528 (Tex. App.—Waco

1980, no pet.) ("There are fundamental maxims of the common law which say [that] [n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are adopted by public policy, and have their foundation in universal law administered in civilized countries.") (internal quotations omitted). To allow Laura to claim her misdemeanor conviction and then-pending felony charge as her only bars to obtaining gainful employment as a teacher would be to impermissibly allow her to derive a financial benefit (spousal maintenance) from her own wrongdoing.

And, even if we could allow such an improper benefit, Laura's misdemeanor conviction and pending felony charge did not automatically disqualify her from teaching as she suggests. Though a school district might be disinclined to hire Laura due to her criminal history, there is no evidence that Laura had lost her certification to teach. In fact, the Education Code provides that only certain felony *convictions* (not including convictions for interfering with child custody) require the revocation of a teaching certificate. *See* Tex. Educ. Code Ann. §§ 21.058(a)–(b). Thus, though her criminal history likely made it more difficult to obtain a teaching job, there was no evidence that she was foreclosed from teaching altogether. Indeed, she testified that Lewisville ISD had offered to rehire her once the divorce had finalized.

Finally, Laura did not prove that she had an inability to earn sufficient income to cover her $1,480 in unmet monthly reasonable needs in some way other than

16

teaching. She was fully healthy, had a bachelor's degree, was a certified behavioral therapist, and she testified that, with more effort, she hoped to evolve the emu-oil business into a profitable enterprise.

Based on these facts, we conclude that legally insufficient evidence supported the trial court's implied finding that Laura lacked the ability to earn sufficient income to meet her minimum reasonable needs. Accordingly, we hold that the trial court abused its discretion by awarding Laura spousal maintenance and sustain Joseph's sole issue.

## III. LAURA'S CROSS-APPEAL

In a single cross-issue, Laura argues that the trial court abused its discretion by awarding her only $6,000 in family-support arrearages. Citing Texas Rule of Civil Procedure 270, she maintains that the trial court abused its discretion by admitting the Posttrial Exhibit and that the evidence adduced at trial proved that Joseph owed more than $70,000 in arrearages. Joseph argues that the trial court did not abuse its discretion by admitting the Posttrial Exhibit because the arrearages amount was not an issue submitted to the jury. And, says Joseph, because the Posttrial Exhibit was properly admitted and Laura did not in any way refute its veracity, the trial court did not abuse its discretion by awarding $6,000 in arrearages based on that evidence. We agree with Joseph.

### A. RELEVANT LAW

Rule 270 provides that

17

> [w]hen it clearly appears to be necessary to the due administration of justice, the court may permit additional evidence to be offered at any time; provided that in a jury case no evidence on a controversial matter shall be received after the verdict of the jury.

Tex. R. Civ. P. 270. When an issue is tried to the bench, a "trial court should liberally exercise its discretion to permit additional evidence in order to allow both parties to fully present their cases." *In re Estate of Huff*, 15 S.W.3d 301, 308 (Tex. App.—Texarkana 2000, no pet.). In a jury trial, an issue is a "controversial matter" if it was submitted to the jury. *See Harrington v. State*, 385 S.W.2d 411, 424 (Tex. App—Austin 1964) ("We understand Rule 270 to refer to a controversial matter which has been or should be submitted to the jury."), *rev'd on other grounds* 407 S.W.2d 467 (Tex. 1966); *see also Jefferson Cnty. v. Nguyen*, No. 09-13-00505-CV, 2015 WL 4597560, at *25 (Tex. App.—Beaumont July 31, 2015, no pet.) (mem. op.) (affirming trial court's admission of post-jury-trial attorney's-fees evidence because the record showed that the issue of attorney's fees was submitted to the trial court rather than the jury).

Here, Laura did not plead a claim for family-support arrearages and though she did ask the jury broadly whether Joseph owed "child-support arrearages," she did not ask it to determine the amount owed. Instead, during both pre- and post-trial litigation, she explicitly requested the trial court to determine the amount of those arrearages. Thus, the issue having been submitted to the trial court rather than the jury, the court had liberal discretion to consider additional evidence to ensure the full presentation of relevant facts. *See Huff*, 15 S.W.3d at 308; *see also In re Dep't of Fam. &*

18

*Protective Servs.*, 273 S.W.3d 637, 646 (Tex. 2009) ("[A] party cannot complain on appeal that a trial court took a specific action that the complaining party requested.").

Accordingly, we hold that the trial court did not abuse its discretion in admitting the Posttrial Exhibit.

Neither did the trial court abuse its discretion in setting the arrearages award amount at $6,000. Laura did not submit any evidence to controvert the Posttrial Exhibit nor does she challenge the contents of that exhibit on appeal. Instead, she argues that the trial court had to rely solely on Trial Exhibit 11—which showed that Joseph owed more than $70,000 in arrearages—in making its determination.

But, having held that the trial court did not abuse its discretion in admitting the Posttrial Exhibit, we likewise conclude that the trial court was free to consider that exhibit when calculating the arrearages amount. *See In re J.R.D.-A.*, No. 04-23-00250-CV, 2023 WL 5068576, at *2 (Tex. App.—San Antonio Aug. 9, 2023, pet. denied) (mem. op.) ("In both legal and factual sufficiency review, the trial court, as factfinder, is the sole judge of the weight and credibility of the evidence."). The Posttrial Exhibit presented evidence that Joseph had made interim support payments such that he owed only $6,000 in arrearages.

For these reasons, we hold that the trial court did not abuse its discretion by awarding $6,000 in arrearages because it had sufficient evidence upon which to make that award and it acted reasonably in applying its discretion to the evidence. *See Hamilton*, 2020 WL 6498528, at *3. We overrule Laura's sole cross-issue.

# IV. CONCLUSION

Having sustained Joseph's sole issue, we reverse the spousal-maintenance award in the final divorce decree and render judgment that Laura take nothing on her spousal-maintenance claim. *See Mehta*, 2023 WL 3521901, at 9 (reversing and rendering spousal-maintenance award). Having overruled Laura's sole cross-issue, we affirm the remainder of the final divorce decree.

/s/ Brian Walker

Brian Walker
Justice

Delivered: August 22, 2024